**SCHNADER HARRISON SEGAL &
LEWIS LLP**
Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1165
Telephone: (856) 482-5222
Facsimile: (856) 482-6980

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Kara M. Wolke
Alexa Mullarky
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff Charles Frischer
and the Proposed Plaintiff Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARLAN ZACHARIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STRAIGHT PATH COMMUNICATIONS, INC., DAVIDI JONAS, AND JONATHAN RAND,<br><br>Defendants. | Case No. 2:15-cv-08051-JMV-MF<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

Page

I.  OVERVIEW OF THE ACTION ................................................................1

II. JURISDICTION AND VENUE .............................................................6

III. PARTIES ................................................................................................7

IV. BACKGROUND ALLEGATIONS.........................................................8

  A.  Overview of Relevant Technology ..............................................8

    1.  Spectrum, Frequencies, and Bands ..................................8

    2.  Fixed Wireless Systems & Backhaul: Straight Path's Purported Class Period Spectrum Operations ...................................................10

      (a)  Backhaul Services Generally .........................................10

      (b)  PTP vs. PMP Backhaul Services ...................................11

      (c)  The Design and Construction of PTP and PMP Systems .............12

    3.  Mobile Data Networks: 5G and Straight Path's Purported Golden Ticket ...........................14

  B.  Overview of FCC Regulations: "Substantial Service" Requirements and the FCC's Trust-Based License Renewal Processes.......................................16

    1.  FCC Spectrum Auctions and Licensing....................................16

    2.  License Renewals and Substantial Service Requirements........................17

    3.  Substantial Service "Safe Harbors" ........................................21

    4.  Applicants Have a Duty of Candor Under FCC's Trust-Based System ....22

V.  SUBSTANTIVE ALLEGATIONS .......................................................22

  A.  Background of Straight Path and Related Entities................................22

  B.  The Acquisition, Failure to Develop, and Fraudulent Renewal of Straight Path's 39 GHz and LMDS Licenses ..............................................24

    1.  IDT Acquires and Fails to Develop Unconstructed Spectrum Licenses; Files False Substantial Service Notifications for Renewal........24

    2.  IDT's Rapaport Separately Obtains Unconstructed Spectrum Licenses; Files False Substantial Service Notifications for Renewal........27

    3.  The Timing of Filing of the Substantial Service Notifications Supports the Conclusion That the Licenses Were Not Actually Constructed As Represented ..........................28

    4.  A Close Review of the Substantial Service Notifications Supports the Conclusion That the Licenses Were Not Constructed As Represented..................28

(a) The Hastily-Prepared Substantial Service Notifications Largely Appear to Be "Cut-and-Paste" Copies ...........................28

(b) While Most Substantial Service Notifications Invoked the 20% Safe Harbor for PMP Services, Defendants Admitted That Straight Path Was Unable to Provide "Substantial" PMP Service.................................................................................30

(c) The Substantial Service Notifications Identify Hub Locations That Appear to Lack the Requisite Equipment and Claim Signal Distances that Cannot Reasonably Be Reached ................33

(d) The Substantial Service Notifications Claim Inflated Service Coverage Based upon Unreasonable Underlying Assumptions ....37

(e) Numerous Substantial Service Notifications Were Amended and Re-Filed Shortly After Filing to Reflect Increased Coverage Based Upon Unreasonable Asumptions .......................40

5. IDT Spectrum Becomes Straight Path Spectrum in July 2013 Spin-Off; Straight Path Further Fails to Construct the Licenses .......................41

C. The Truth About Straight Path's Supposedly Valuable Licenses Emerges...........43

D. Defendants' Post-Class Period Admissions............................................................52

VI. MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .........54

VII. ADDITIONAL SCIENTER ALLEGATIONS ................................................................91

A. Straight Path's Spectrum Business Was and Is Its Core Operation......................91

B. Straight Path Spectrum Is Merely IDT Spectrum Renamed; Also, the Individual Defendants Were Both IDT Executives Involved in Spectrum-Related Activities Prior to the Straight Path Spin-Off...........................................91

C. A Private Trust Created for the Benefit of Defendant Jonas's Father, Howard Jonas, Holds a Majority of Straight Path Voting Power ......................................93

D. Both Individual Defendants Sold Straight Path Stock During the Class Period and Enjoyed Performance-Based Compensation and Bonuses ...........................94

VIII. LOSS CAUSATION............................................................................................96

IX. PRESUMPTION OF RELIANCE .........................................................................97

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .........................................................................................98

XI. PLAINTIFF'S CLASS ACTION ALLEGATIONS................................................99

XII. CAUSES OF ACTION ........................................................................................101

XIII. PRAYER FOR RELIEF ......................................................................................105

XIV. DEMAND FOR TRIAL BY JURY.......................................................................105

Lead Plaintiff Charles Frischer ("Plaintiff" or "Lead Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and on information and belief as to all other matters. The within allegations are based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls, and announcements made by Defendants, Defendants' filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Straight Path Communications, Inc. ("Straight Path", "SPCI", or the "Company"), analysts' reports and advisories about the Company, a review of documents obtained from the Federal Communications Commission ("FCC"), and other information obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    OVERVIEW OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the common stock of Straight Path from October 29, 2013 to November 5, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.      On July 31, 2013, Defendant Straight Path was spun-off by its parent company, IDT Corporation ("IDT Corp." or "IDT"), with the son (Defendant Davidi Jonas) of IDT's founder (Howard Jonas) taking the helm of the newly-independant company.

3.      As an independent public company, Straight Path's primary operation during the Class Period involved – ostensibly – the holding, leasing, and marketing of licenses issued by the

Federal Communications Commission ("FCC"). These licenses granted to Straight Path the rights and obligations to develop and use certain frequency bands of electromagnetic spectrum (or "spectrum") designated and allocated by the FCC for specific types of wireless communications. Straight Path, in turn, purportedly generated revenue by leasing these spectrum use rights to existing third party wireless internet service providers (WISPs) and cellular communications companies for the provision of "backhaul" services. In all, Straight Path purported to hold approximately 961 FCC licenses on the 28 GHz and 39 GHz frequency bands during the Class Period.

4.      Defendants' growth "story" for the Company, however, was far grander than the mere leasing of its supposed FCC licenses. Instead, Defendants set their sights – and focused the market's attention – on the supposed unique ability of Straight Path's spectrum holding to host emerging 5G cellular technology, and the supposedly "monumental" opportunity that presented for the Company (and, supposedly, investors). Acccording to Defendants, Straight Path's spectrum holdings not only presented the "premier frequency" for 5G operations, their licenses would serve as a "critical element" of 5G operations.

5.      Thus, in the span of less than two years following Straight Path's spin-off from IDT, Defendants created the appearance of a healthy and growing public company with a market cap of over $300 million. They built this façade upon the shaky foundation of two essentially worthless divisions of IDT that became Straight Path in the spin-off, and they did so by – in the words of Defendant Jonas, himself – "***telling the story, creating an interest on the Street relating to Straight Path and 5G***[.]" Defendant Jonas further boasted the Company's purported success following the spin-off as follows:

> To look at it historically, we took two divisions that accounted for almost none of the value of IDT, and in the span of less than two years, we have created a public company with a market cap of over $300 million. I think that in itself is important for investors to recognize.

6. During the Class Period, Defendants also repeatedly touted Straight Path's supposed monopoly on the 39 GHz band at issue – claiming to control over 96% of the 39 GHz band and that Straight Path's spectrum holdings covered "every inch" of the United States. As such, Defendant Jonas urged that the investing public should understand "the compelling story about 5G and mobility" and insisted that Straight Path was "2,700 times undervalued" with a "huge potential opportunity for growth and upside" relating to 5G mobile. Indeed, Defendants insisted that 5G presented a "monumental opportunity" and would be a "game changer" for Straight Path.

7. Based in part upon this purported value of Straight Path's FCC spectrum licenses and promised growth with respect thereto, through the false and misleading statements alleged herein, Defendants were able to artificially inflate Straight Path's share price from a mere $5.82 on October 28, 2013, the start of the Class Period herein, to a Class Period high of $49.72 on October 23, 2015.

8. However, Straight Path's licensed frequencies did not come close to offering the supposed prime spectrum real estate for 5G mobility as Defendants maintained. To the contrary, not only were Straight Path's spectrum licenses not approved for the provision of mobile services, they suffered from severe propagation limitations, including weather and object interference (the high frequencies at issue herein, 28 GHz and 39 GHz, have relatively short range, are highly susceptible to disruption by rain and fog, and are unable to travel through everyday obstructions such as buildings, hills, large trees, trucks, or busses, for example). Moreover, Straight Path's spectrum holdings fell well short of providing the contiguous coverage over "every inch of the United States" as claimed by Defendants.

9. Thus, the first major crack in Defendants' façade of health and growth appeared on October 29, 2015, when Kerrisdale Capital published a report entitled "Straight Path Communications Inc. (STRP) The Next Generation of Overblown Spectrum Hype" (the "Kerrisdale

Report"), calling into question Defendants' 5G claims. The Kerrisdale Report revealed to investors not only that Defendants' claimed holdings in, and monopoly over control of, the 28 GHz and 39 GHz spectrum bands was vastly overstated, but also that these spectrum bands were not "crucial" to 5G technology as Defendants had claimed. On this news, the Company's shares fell $18.23 per share, from $47.58 to close at $29.35 per share on October 29, 2015 (a drop of over 38%), thereby damaging investors.

10.     Unfortunately for investors, the damage flowing from Defendants' lies and half-truths only got worse from there. A further blow came on November 5, 2015, when Sinclair Upton Research published a report entitled "Straight Path Communications Inc. (STRP) *How to commit fraud against the FCC and get away with it (until now)*" (the "Sinclair Report") (emphasis in original). Among other damning findings, the Sinclair Report asserted that FCC-required renewals of Straight Path's spectrum licenses were "obtained under fraudulent misrepresentation, because ***the systems were never built on the sites as specified in the filings***." (emphasis added.)  On this news, the Company's shares fell $13.70 per share, from $26.51 to close at $12.81 per share on November 5, 2015 (a drop of almost 52%), thereby damaging investors.

11.     Indeed, as painstakingly detailed herein, the vast majority of the spectrum licenses that Straight Path claimed to control – *i.e.*, the entire potential value of the Company – were based on fraud. Specifically, in order to secure renewal of spectrum licenses such as those held by Straight Path, the FCC requires licensees to file "Substantial Service Notifications" attesting that the licenses are: (i) actually developed (or "constructed"); and (ii) providing "substantial service" to the populations covered by the licenses. Straight Path's spectrum licenses, however, were never constructed as represented, or if anything at all *was* constructed, the purported systems fell woefully

short of satisfying the "substantial service" requirements for renewal – thereby subjecting the licenses to the very real risk of *automatic termination and forfeiture*.

12.     In sum, Defendants knew or recklessly disregarded and failed to disclose during the Class Period that Straight Path's spectrum licenses were subject to *automatic termination at any time*. For their part, after the Sinclair Report was published, Defendants sat by silently as Straight Path's stock price plummeted. They did not even *attempt* to refute the very serious facts and allegations levied in the Sinclair Report, instead stating through a Company spokesperson that Straight Path "does not respond to anonymous reports."

13.     Then, after the close of the Class Period herein – and incredibly disclaiming any knowledge of whether Straight Path's spectrum licenses were in operation (or whether operable systems ever even existed) – Defendants purported to conduct an "investigation" into the supposed operation of its spectrum licenses. On December 1, 2015, Defendants admitted that "[t]he preliminary results of our investigation into the renewal allegations indicate that *a significant amount of the equipment* that had been installed in connection with the substantial service showings *is no longer present at the original locations*." (emphasis added.)

14.     While Defendants have continued to insist in their required quarterly SEC filings made so far this year that "a significant amount of the equipment" that "had been installed" was somehow removed without their knowledge from the supposed sites of construction, they have provided no details in support of this statement and *they have refused to take questions on the matter during quarterly earnings calls*. Defendants' suggestions that (i) many tens (or hundreds) of millions of dollars of supposed investment in construction of these sites merely disappeared without a trace, and (ii) that these licenses which were (supposedly) once in operation and providing

substantial service to tens of millions of individuals suddenly stopped operating without their knowledge, are ludicrous.

15.     Finally, in a brazen display of chutzpah, and hoping to "back" their way into showing substantial service after committing the massive fraud on the FCC and investors detailed herein, Defendants proclaimed that "[r]ather than wait[ing] for the results of the investigation, we are deploying equipment across our 39 GHz holdings…." Now, apparently, Defendants are scrambling to meet the basic requirements of substantial service that were supposedly fulfilled years ago; as Defendants themselves recognize, however, there is no guarantee that this desperate action will save Straight Path's spectrum licenses.

16.     Let there be no mistake: the facts as alleged herein show that the vast majority of sites claimed to have been constructed in the Substantial Service Notifications filed for Straight Path's FCC licenses *were never built*. The failure to construct these licenses, and the fraudulent renewals of the same, subjected these licenses – ***the core of Straight Path's "operations" and the entirety of the Company's supposed value*** – to automatic termination. Defendants' failure to disclose this information, and other material information contradicting the licenses' supposed value in relation to 5G mobile, is actionable. Indeed, as set forth herein, Defendants' public statements concerning Straight Path's spectrum license holdings, and the prospects of 5G mobile, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## II.     <u>JURISDICTION AND VENUE</u>

17.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.    Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)), as a substantial part of the conduct complained of herein occurred in the District, the Company maintains an office in the District, and the Company conducts business in this District.

20.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.    **PARTIES**

21.    Lead Plaintiff Charles Frischer, as set forth in the Certification previously filed and incorporated herein by reference, acquired Straight Path common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.    Defendant Straight Path was incorporated in April 2013 in the State of Delaware as a wholly-owned subsidiary of IDT Corporation ("IDT Corp." or "IDT"), a telecommunications company started by Defendant Davidi Jonas's father, Howard Jonas, in 1990. On July 31, 2013, Straight Path was spun-off by IDT Corporation to become an independent public company, trading on the NYSE under the ticker symbol "STRP." Straight Path operates through two subsidiaries: (1) the wholly owned Straight Path Spectrum, Inc. (formerly IDT Spectrum, Inc., and referred to herein as "Straight Path Spectrum" or "SPSI"), which holds, leases, and markets fixed wireless spectrum licenses through its own wholly owned subsidiary, Straight Path Spectrum, LLC; and (2) the 84% owned Straight Path IP Group, Inc. ("Straight Path IP" or "SPIP"), which owns a number of patents

that apply to various internet communications technologies, namely voice-over Internet protocol (or "VoIP") and makes most of its revenue from the settlement of IP litigation. The revenues generated by SPIP's patent litigation were used primarily to fund the spectrum-related operations of SPSI, the core of Straight Path's business.

23.     Defendant Davidi Jonas ("Jonas") has served as the Company's Chief Executive Officer ("CEO") since April 2013 and throughout the Class Period. Jonas also has served as Chairman of the Board of Straight Path since August 1, 2013. Jonas has been the manager of Straight Path Spectrum since August 2012 and Executive Vice President and director of Straight Path IP Group since November 2012. Prior to his work with Straight Path, Jonas served as Vice President of Business Development for IDT Corporation.

24.     Defendant Jonathan Rand ("Rand") has served as the Company's Chief Financial Officer ("CFO") since June 2013 and throughout the Class Period. Rand also served as Executive Vice President of Sales & Finance and Treasurer of IDT Corp. from 1992 to 1998.

25.     Together, Defendants Jonas and Rand are sometimes referred to herein as the "Individual Defendants."

26.      Defendant Straight Path and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     BACKGROUND ALLEGATIONS

### A.     Overview of Relevant Technology

#### 1.     Spectrum, Frequencies, and Bands

27.     All wireless communication signals travel over the airways via radio frequencies of electromagnetic spectrum or "spectrum."  Put another way, "spectrum" serves as the highway upon which radio, television, cellular telephone, and mobile data information travels.

28.    A specific frequency (or range of frequencies) of spectrum is sometimes referred to as a "frequency band" or "band."

29.    Because two transmissions sharing the same frequency band in the same geographic area would cause mutual interference, spectrum usage is regulated. The FCC governs spectrum use in the United States and U.S.-controlled territories and is responsible for the allocation and assignment of specific frequency bands (*see* ¶¶53-59, *infra*).

30.    The various frequency bands are generally identified as follows:

(i)    Very low frequencies ("VLF") range from 3 to 30 kilohertz ("kHz"). Time signals and standard frequencies are among the users of this band.

(ii)    Low frequencies ("LF") range from 30 to 300 kHz. Fixed, maritime mobile and navigational systems and radio broadcasting are among the users of this band.

(iii)    Medium frequencies ("MF") range from 300 to 3000 kHz. Land, maritime mobile and radio broadcasting are among the users of this band.

(iv)    High frequencies ("HF") – also called "shortwaves" – range from 3 to 30 megahertz ("MHz"). Fixed, mobile, aeronautical and marine mobile, amateur radio, and radio broadcasting are among the users of this band.

(v)    Very high frequencies ("VHF") range from 30 to 300 MHz. Fixed, mobile, aeronautical and marine mobile, amateur radio, television and radio broadcasting, and radio navigation are among the users of this band.

(vi)    Ultra high frequencies ("UHF") range from 300 to 3000 MHz. Fixed, mobile, aeronautical and marine mobile, amateur radio, television, radio navigation and location, meteorological, and space communication are among the users of this band.

(vii)   Super high frequencies ("SHF"), also referred to as the "microwave" band, range from 3 to 30 gigahertz ("GHz"). Fixed, mobile, radio navigation and location, and space and satellite communication are among the users of this band.

(viii)   Extremely high frequencies ("EHF"), also called Milimeter-wave frequencies ("mmWave"), range from 30 to 300 GHz. Amateur radio, satellite, and earth and space exploration are among the users of this band.

31.   Most industry participants commonly include frequencies ranging as low as 20 GHz in the mmWave category. Indeed, Defendants often referred to both Straight Path's 28 GHz and 39 GHz license holdings as mmWave bands.

32.   Signals in the SHF and EHF bands – which include Straight Path's license holdings in this case – are very susceptible to interference by weather, including rain, humidity, snow, and fog (*i.e.*, "RainFade"), and object interference and physical blockages by mountains, trees, buildings, and large busses or trucks. Signals at these frequencies also are subject to absorption by gases in the atmosphere, which further reduces their potential range. As a result, these signals ***have a relatively short range of approximately one to two kilometers*** (.62 to 1.2 miles), and these bands are currently relegated to niche and/or highly specialized *nonmobile* (or fixed) uses due to their short wavelength and limited propagation.

### 2.   Fixed Wireless Systems & Backhaul: Straight Path's Purported Class Period Spectrum Operations

#### (a)   Backhaul Services Generally

33.   "Fixed wireless" refers to the operation of wireless devices or systems in fixed locations such as homes, schools, and offices. Fixed wireless devices usually derive their electrical power from a utility source, unlike mobile wireless devices, which tend to be battery-powered.

34.     "Backhaul" is, generally speaking, an intermediate fixed wireless communication infrastructure that connects smaller networks with a primary (or backbone) network. It mainly involves the carriage of data and voice traffic from users via network access points back to the providers' network hubs. It also may be used as an alternative communication medium when connection to the primary network is unavailable.

### (b)     PTP vs. PMP Backhaul Services

35.     Point to point ("PTP") backhaul requires line-of-sight connectivitity with highly directionalized antennae at each end.  For PTP operations, two endpoints directly facing each other are required to create one "link" of connectivity.

36.     Point to multipoint ("PMP") backhaul can be envisioned as a bicycle wheel: a centralized aggregation point (the hub) transmits a signal over the entire 360-degree area of the wheel, while signals travel between the hub and small outdoor cells that are placed around a coverage area within line-of-sight of the hub on existing structures such as buildings, street lights, or traffic lights (the spokes). These signals are then sent from the hub to the mobile or internet service carrier's network. In sum, the core of any PMP backhaul services operation is a hub transmitter optimized for 360-degree operation.

37.     In Straight Path's FY 2013 Form 10-K, Defendants described PTP and PMP backhaul as follows:

> Wireless backhaul operations can be deployed using point-to-point or point-to-multipoint installations. Point-to-point is typically line-of-sight with highly directive antennas at each end of the link. This requires dedicated transceiver hardware at each end of the link. In point-to-multipoint applications a transceiver can support multiple small cells or other collection points thus reducing the expense of additional hardware and the space demands of that equipment. Our spectrum holdings are expressly authorized for point-to-multipoint applications by FCC rulemaking. In deployments to support small cell backhaul, the hub uses multiple sector antennas to provide connectivity to a number of terminals anywhere around the hub site. New small cell sites can be added without revisiting the hub site.

38.     The Substantial Service Notifications filed for Straight Path's 39 GHz spectrum licenses reflect that at least 774 licenses purported to operate PMP systems, while only approximately 39 licenses purported to operate PTP systems.

### (c)     The Design and Construction of PTP and PMP Systems

39.     The height of the placement of a PMP hub (or transmitting antenna) is an integral determinant of the maximum coverage the system may provide. Because line-of-sight connectivity is required, PMP hubs must be placed high enough to: (i) avoid object interference (such as trees, hills, buildings), and (ii) account for the curvature of the Earth (the closer a hub is to the ground, the shorter distance a signal may travel before it intersects the curvature of the Earth). For line-of-sight systems, the farthest possible point of propagation (*i.e.*, the farthest point a transmitter can send a signal) from a given height until the signal will intersect the Earth is referred to as the "radio horizon."

40.     The following chart provides a best-case estimation of the maximum distance a signal may travel (in perfect conditions) from various transmission antenna heights:

| transmission antenna height (approx.) | distance to radio horizon (approx.)[1] |
|---|---|
| 100 feet (approx. 10-story building) | 12.3 miles |
| 75 feet (approx. 7-story building) | 10.6 miles |
| 50 feet (approx. 5-story building) | 8.7 miles |
| 20 feet (approx. 2-story building) | 5.5 miles |

41.     The higher the frequency band used by a PMP hub, however, the more susceptible it is to RainFade and/or Free Space Path Loss (the natural loss of signal strength as it moves through free space, which loss increases as distance increases). Such atmospheric interference, including RainFade and Free Space Path Loss, must be considered and factored into determining signal coverage and actual quality of service.

---

[1] Horizon (in miles) = 1.23 x the square root of the height (in feet).

42.     In addition, PMP systems that purport to provide wider signal coverage (in terms of degrees) will generally employ antennas with lower "gain." Antenna gain can be most easily understood as the "boost" that the design of a transmitting antenna can give the signal in one particular direction to enable a signal to stay strong longer as it travels in that direction (and the same on the receiving end). If the receiving antenna is highly-directionalized and "listening" in the right direction, its design may enhance a signal that's weak; this is "antenna gain." Thus, while a higher antenna gain may enhance the distance a signal may travel in one direction, it will necessarily limit the width of the coverage area (in terms of degrees) receiving service.

43.     PTP systems, meanwhile, present their own significant construction challenges in that direct line-of-sight connectivity between a directionalized transmitting antenna and one directionalized receiving antenna is required. Such construction often would require obtaining approval for, and likely incurring lease expenses associated with, the placement of equipment for multiple communication points within a covered area.

44.     Development and construction of the hundreds of licenses that Straight Path claimed to own can be expected to cost in excess of tens (or even hundreds) of millions of dollars. In addition to the costs of equipment and construction alone (including, for example, purchasing antennae, and the construction of towers, if necessary), licensees have to expend substantial amounts designing and planning their systems, connecting transmitters to electrical power, connecting transmitters to the greater Internet network (whether by coax cable, fiberoptics, or microwave (which itself would require additional antennae)), and on all of the labor, regulatory, and legal costs associated with such construction, as well as testing the constructed systems. In addition, placement of transmitting or receiving equipment upon third party property or an existing structure will likely incur additional leasing costs.

### 3.    Mobile Data Networks: 5G and Straight Path's Purported Golden Ticket

45.    During the Class Period and as alleged herein, Defendants often cited an expansion to mobile services, especially in connection with the deployment of 5G technology, as Straight Path's main success and growth opportunity. Claiming that Straight Path's license holdings were a "critical element" of the future of mobile broadband, Defendants insisted that "5G is a game changer" and "monumental opportunity" for the Company.

46.    Cellular "data" generally encompasses all cellular and mobile device activity other than regular voice calls and simple text messaging.  Specific examples of data use can include downloading apps, checking email, viewing websites, streaming or downloading video for mobile viewing, and downloading photographs.  In short, data services comprise some of the most desired and important functions of mobile devices used today.  Mobile users rely upon mobile data networks for these functions when a WiFi connection is not available.  Thus, *the adequacy and reliability of the data network is integral to the mobile consumer experience*.

47.    The fastest and most advanced mobile data network available today is 4G LTE. "4G" refers to the fourth generation of data technology that forms cellular networks. "LTE" is an acronym for Long Term Evolution, which refers to the technical process by which voice and high-speed data is transmitted over networks for cellular phones and other mobile devices. Verizon, the largest provider of 4G LTE in the U.S., currently offers 4G LTE coverage in over 200 U.S. markets.

48.    While "5G" is generally regarded as the next major generation of cellular or mobile data technology after 4G LTE, it is still years away from standardization and commercial release, with most industry players recognizing that 5G rollout will not occur until after 2020 or even 2025. One impediment to 5G is that companies do not want to cannibalize their own current business, with LTE technology still in the early stages of its lifecycle.

49.     The FCC has not yet allocated any frequency bands for 5G. Industry commentators recognize that the eventual 5G rollout will likely occur on newly-allocated low-frequency bands, which have significantly better propagation (or range) characteristics than mmWave and other high frequency bands.  Current spectrum capacity also could be expanded through technologies, such as Multiple Input/Multiple Output (or "MIMO"), that are able to greatly enhance capacity in bands that are already used for existing 3G or 4G networks.

50.     While mmWave *may* theoretically provide one spectrum path for 5G technology deployment, mmWave frequencies have considerable shortcomings, and many 5G networks likely will not utilize mmWave or other extremely high frequencies. As discussed in ¶¶32, 41 above, mmWaves are highly susceptible to weather interference, have relatively short range, and are largely incapable of penetrating inside of buildings from the outside or travelling over hills. Indeed, random obstructions such as large trees, trucks, busses, or other large things or structures could well cause service disruptions. Thus, use of the mmWave band for 5G mobile operations will present considerable challenges.

51.     Even if the FCC were to allocate 28 GHz or 39 GHz bands for 5G, Straight Path would need to overcome a number of other regulatory obstacles before realizing siginificant value from its spectrum licenses. For example, the FCC has proposed licensing mobile services on a county-wide basis, as opposed to a BEA-wide basis, a move which Straight Path itself recognizes would "present administrative and technical challenges for mmWave operations and discourage investment in 5G services and technologies."[2] Moreover, contrary to Defendants' Class Period claims of having large "contiguous blocks" of service that cover "every inch of the United States," in a tacit admission that its spectrum blocks were largely fractured (not contiguous), Straight Path also

---

[2] *See In the Matter of Use of Spectrum Bands Above 24 GHz For Mobile Radio Services, et al.*, Comments of Straight Path Communications, Inc. (January 27, 2016), at p. 3.

15

requested that the FCC approve a pre-auction spectrum exchange program to consolidate BEA-based spectrum blocks. Defendants recognized that without such an exchange/consolidation program, Straight Path is unlikely to secure the type of large contiguous spectrum blocks necessary for 5G deployment. Further, the FCC is considering: (i) whether incumbent licensees should be granted mobile operating rights; (ii) whether licenses should be exclusive, or if overlay licenses should be auctioned in the 28 and 39 GHz bands; (iii) whether security requirements should be implemented, despite the negative effect this may have on the evolution of 5G technologies; and (iv) whether mobile and satellite services should be allowed to operate in the same band, despite the high risk of interference scenarios. In sum, all of these myriad issues must be resolved *in favor of Straight Path* for 5G to even be a potential "game changer" for the Company.

52.     Notwithstanding (and without sufficiently disclosing) the foregoing, Defendants largely touted 5G as Straight Path's main value and its key to future growth and success. *See, e.g.* ¶¶187, 214, 219, 222, 224.

**B.     Overview of FCC Regulations: "Substantial Service" Requirements and the FCC's Trust-Based License Renewal Processes**

**1.     FCC Spectrum Auctions and Licensing**

53.     The FCC is the regulatory body responsible for governing the wireless spectrum. The FCC designates and controls use of the spectrum by auctioning licensing (usage) rights which generate billions of dollars in revenue for the U.S. government; the spectrum auction currently underway is expected to generate between $20-$80 billion in revenue for the U.S. government.

54.      The FCC also regulates which services can be offered on any given frequency band, known as allocation. Currently, the FCC has allocated only frequency bands between 9kHz and 275 GHz. Historically, spectrum ranging between 700 MHz and 2.6 GHz – much lower than the 28 GHz and 39 GHz licenses at issue in this litigation – has been allocated for mobile services.

55.     Spectrum licenses such as the ones at issue in this litigation are primarily licensed by the FCC in Basic Economic Areas ("BEAs" or "EAs") or Basic Trading Areas ("BTAs").

56.     During 1998-2000, the FCC auctioned large blocks of spectrum in what are known as (i) the Local Multipoint Distribution Service ("LMDS") band,  and (ii) the 39 GHz band. Currently, the U.S. is divided into 176 BEAs for the 39 GHz band and 493 BTAs for the LMDS Band.

57.     The LMDS band is designated for broadband fixed services, and was originally envisioned as a multichannel wireless cable TV medium. Despite initial investment attraction, the LMDS band has not proved to be commercially successful. A number of companies, including Winstar Communications (*see* ¶79, *infra*), that initially purchased these spectrum blocks eventually ended in bankruptcy.

58.     "39 GHz" refers to spectrum allocated within the 38.6-40 GHz band. The 39 GHz band is designated for fixed point-to-point or point-to-multipoint microwave operations to provide communications infrastructure such as "backhaul" and "backbone" communications links.

59.     While the FCC has not expressly *limited* the LMDS and 39 GHz bands to fixed or backhaul uses, the FCC has not approved these bands for mobile use. Thus, during the Class Period, Straight Path's FCC spectrum licenses were not approved for the provision of mobile services.

### 2.     License Renewals and Substantial Service Requirements

60.     To obtain renewal of a license, licensees must comply with FCC construction and coverage requirements, which are set forth in the Code of Federal Regulations. Licenses in 39 GHz and LMDS bands are subject to Part 101 of the FCC's Rules, codified at 47 CFR § 101.

61.     Generally speaking, wireless and telecommunications services licensees are supposed to construct their authorized system to meet specific coverage requirements within a given time

period (the "buildout deadline") and to notify the FCC that the requirement was met by submitting a "Notice of Construction/Coverage" or a "Substantial Service Notification" to the FCC.

62.     Most FCC licenses and renewals – including the LMDS and 39 GHz licenses at issue in this case – have a buildout deadline of ten (10) years. If the licensee fails to renew the license via a showing that the licensee is providing "substantial service" to the licensed area within 10 years of the initial license grant, and no Request for Extension is submitted to and approved by the FCC prior to the time of expiration, the license will automatically terminate.

63.     The FCC *may* grant an extension of the deadline for showing substantial service if the licensee shows that its failure to provide substantial service "is due to involuntary loss of site or other causes beyond its control." 47 C.F.R. § 1.946(e)(1).

64.     The FCC has defined "substantial service" as "service which is sound, favorable, and **substantially above a level of mediocre service** which just might minimally warrant renewal." *See, e.g.*, 47 C.F.R. §§ 22.940(a)(1)(i), 24.203(d), 101.527(a), 101.1011(a).[3]

65.     Per the FCC, the purpose of the substantial service requirement is to "**ensur[e] that service is being provided to the public**" and to "promote efficient use of the spectrum, encourage the provision of service to rural, remote, and insular areas, and **prevent the warehousing of spectrum**." *See* 39 GHz Report and Order ("R&O"), 12 FCC Rcd at 18624 ¶ 46; Second LMDS R&O, 12 FCC Rcd at 12659 ¶ 266 (emphasis added). The FCC similarly stated in its Order dated June 26, 2009 regarding the 39 GHz band that the substantial service requirement is necessary "**to ensure that service is indeed being provided to the public**." 24 FCC Rcd 859 (citing 47 C.F.R. § 101.17).

66.     47 CFR 101.17, which sets forth the substantial service requirements for license renewal for the 39 GHz band, provides:

---

[3] All emphasis is added unless otherwise stated.

§ 101.17 Performance requirements for the 38.6-40.0 GHz frequency band.

(a) All 38.6-40.0 GHz band *licensees must demonstrate substantial service at the time of license renewal*. A licensee's substantial service showing should include, but not be limited to, the following information for each channel for which they hold a license, in each [Economic Area] EA or portion of an EA covered by their license, in order to qualify for renewal of that license. The information provided will be judged by the Commission to determine whether the licensee is providing service which rises to the level of "substantial."

(1) A description of the 38.6-40.0 GHz band licensee's *current service in terms of geographic coverage*;

(2) A description of the 38.6-40.0 GHz band licensee's *current service in terms of population served*, as well as any additional service provided during the license term;

(3) A description of the 38.6-40.0 GHz band *licensee's investments in its system(s)* (type of facilities constructed and their operational status is required);

(b) *Any 38.6-40.0 GHz band licensees adjudged not to be providing substantial service <u>will not have their licenses renewed</u>*.

47 CFR 101.17.

67.    47 CFR § 1.946(c), which also applies to 39 GHz licenses, further provides: "*If a licensee fails to commence service or operations by the expiration of its construction period or to meet its coverage or substantial service obligations by the expiration of its coverage period*, *its <u>authorization terminates automatically</u>* (in whole or in part as set forth in the service rules), without specific Commission action, on the date the construction or coverage period expires."

68.    The FCC has made clear that "*Failure by any [39 GHz] licensee to meet this [substantial service] requirement will result in <u>forfeiture</u> of the license and the licensee will be <u>ineligible to regain it</u>*." 24 FCC Rcd 859 (citing 47 C.F.R. § 101.17).

69.    47 CFR 101.1011, which sets forth the substantial service performance requirements for license renewal for the LMDS band, similarly provides:

§ 101.1011 Construction requirements and criteria for renewal expectancy.

(a) *LMDS licensees must make a showing of "substantial service" in their license area within ten years of being licensed. "Substantial" service is defined as service which is sound, favorable, and substantially above a level of mediocre service which might minimally warrant renewal. Failure by any licensee to meet this requirement will result in <u>forfeiture</u> of the license and the <u>licensee will be ineligible to regain it.</u>*

47 CFR 101.1011.

70.     Simply put, to comply with the "substantial service" requirements for renewal under either 47 CFR 101.17 (for the 39 GHz band) or 47 CFR 101.1011 (for the LMDS band), the system must *at least* be built, operational, and actually providing "substantial service" to the licensed area.

71.     Straight Path itself recognized and described the "substantial service" requirements applicable to its LMDS and 39 GHz licenses in the Company's Form 10-K filed with the SEC on October 29, 2013 for the period ending July 31, 2013 (the "FY 2013 10-K") as follows:

*Our spectrum licenses in the LMDS and 39 GHz bands are granted for ten-year terms.* The renewal date for our New York City LMDS license is in February 2016, renewal dates for our 132 other LMDS licenses are in 2018, and the renewal dates for our 39 GHz EA licenses are in 2020. A "substantial service" requirement applies to each of these LMDS and 39 GHz licenses.... *If the FCC finds that a licensee has failed to meet the substantial service requirement for any license, however, that authorization is subject to termination.*[4]

72.     In Straight Path's FY 2013 Form 10-K, however, Defendants wrongly suggested that the Company was only to provide substantial service on its licenses during the *initial* license term:

*Although the FCC's rules currently require that a wireless licensee in our spectrum bands demonstrate substantial service <u>only during its initial license term</u>,* the FCC is considering whether to apply additional or more stringent performance requirements in conjunction with the license renewal process for subsequent license terms. If we are unable to meet any current or future requirements for renewal of any of our licenses, they may be subject to termination.

---

[4] Straight Path repeated this paragraph describing "substantial service" requirements in each of its FY 2014 and FY 2015 Form 10-K filings.

73.    Contrary to Straight Path's statement, as a commmon carrier, Straight Path's substantial service operational requirements remained in effect beyond the initial license term and, per the FCC, licenses are also subject to cancellation for discontinuance of operation or failure to provide service. *See* 47 C.F.R. § 101.305(d) (if a license is not used to provide service for a twelve-month period, or if facilities are not operational because equipment has been removed, license is subject to cancellation).

### 3.    Substantial Service "Safe Harbors"

74.    While refraining from establishing strict buildout specifications, the FCC has promulgated a "safe harbor" providing that the "substantial service" requirement for renewal of a 39 GHz license will be deemed to have been met by a showing of "construction and operation of ***four [microwave] links per million*** population within a service area." *See In the Matter of Amendment of the Comm'n's Rules Regarding the 37.0-38.6 & 38.6-40.0 GHz Bands*, 12 FCC Rcd at 18624-18625, ¶ 46 (Oct. 24, 1997).

75.    The FCC has similarly promulgated a so-called "safe harbor" for LMDS licensees:

> [F]or an LMDS licensee that chooses to offer point-to-multipoint services, a demonstration of coverage to ***20 percent of the population*** of its licenses service area at the 10-year mark would consitute substantial service. In the alternative, an LMDS licensee that chooses to offer fixed, point-to-point services, the construction of four permanent links per one million people in its licensed service area at the 10-year renewal mark would constitute substantial service.

*In the Matter of Rulemaking to Amend Parts 1, 2, 21, & 25 of the Comm'n's Rules to Redesignate the 27.5-29.5 GHz Frequency Band, to Reallocate the 29.5-30.0 GHz Frequency Band, to Etsablish Rules & Policies for Local Multipoint Distribution Service & For Fixed Satellite Services*, 12 FCC Rcd. at 12660  12 FCC Rcd at 12660, ¶¶ 269-70 (Mar. 13, 1997).

### 4. Applicants Have a Duty of Candor Under FCC's Trust-Based System

76.     The FCC does not perform an independent investigation as to the truthfulness or accuracy of information contained in a licensee's Substantial Service Notifications. Rather, all applicants seeking licenses from the FCC have a "duty of candor" – an affirmative duty to fully and truthfully disclose information required in their submissions. *In re Sobel*, 17 FCC Rcd. 1872, 1891 (Jan. 25, 2002) (citing *RKO General v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981) ("[T]he Commission must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfil its statutory mandate. This duty of candor is basic, and well known.")).

77.     The FCC views as a lack of candor any "concealment, evasion, or other failure to be fully informative, accompanied by an intent to deceive the Commission[.]" *See In re Application Discussion Radio, Inc.*, 19 FCC Rcd. 7433, 7435 (Apr. 16, 2004). Lack of candor may take any of the following forms: "(1) misrepresentation, which involves 'false statements of fact'; and, (2) failure to disclose, which involves 'concealment, evasion, or other failures to be fully informative.'" *In re Applications of Metacomm Cellular Partners*, 13 FCC Rcd. 12192, 12201 (June 23, 1998) (citing *Fox Television Stations ("Fox I")*, 10 FCC Rcd. 8452, 8478 (May 4, 1995)). Denial of an application or revocation of a license may result when a lack of candor is discovered. *In re Sobel*, 17 FCC Rcd. 1872, 1893-1894 (Jan. 25, 2002).

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background of Straight Path and Related Entities

78.     During the Class Period, Straight Path claimed to hold approximately 828 licenses in the 39-GHz band and 133 licenses in the Local Multipoint Distribution Service ("LMDS") band (at the 28 GHz frequency). During the Class Period, Defendants described these spectrum licenses as

"core assets" in Straight Path's SEC filings. Straight Path acquired its spectrum licenses through an opaque series of acquisitions and transfers, beginning with Straight Path's former parent company, IDT Corp., as recounted herein below.

79.     IDT Corp. is a telecommunications company founded in 1990 by Howard Jonas, the father of Defendant Jonas. IDT's current Chief Executive Officer is Defendant Jonas's brother, Shmuel Jonas.

80.     In or around 2001, IDT Corp. created a wholly-owened subsidiary called Winstar Holdings, LLC ("Winstar Holdings") to own approximately 931 39 GHz licenses and 16 LMDS licenses (the "Winstar Licenses") that IDT purchased in 2001 from Winstar Communications, Inc., a U.S. telecom company that filed for bankruptcy that year. The Winstar Licenses were held by IDT in the name of another wholly-owned subsidiary, Winstar Spectrum, LLC ("Winstar Spectrum").

81.     In January 2005, IDT created another wholly-owned subsidiary known as IDT Spectrum, LLC ("IDT Spectrum"), which replaced Winstar Spectrum. According to IDT's 2005 Form 10-K, IDT Spectrum would serve as a "division to operate and market wireless spectrum products and solutions."   Thereafter, all of IDT's FCC spectrum licenses, including the Winstar Licenses, were held by IDT Spectrum.

82.     From 2007 to 2012, Michael Rapaport ("Rapaport") served as the president and CEO of IDT Spectrum. In 2012, Rapaport also headed an entity called Spectrum Holdings Technologies, LLC ("Spectrum Holdings"), whose business also focused on the procurement of FCC spectrum licenses. Although Rapaport left IDT before the Straight Path spin-off, Straight Path's FY 2013 10-K also refers to Rapaport as "the Former SPSI [Straight Path Spectrum, Inc.] CEO."

83.     Straight Path, a Delaware corporation, was incorporated in April 2013 as yet another wholly-owned subsidiary of IDT Corp. Effective July 31, 2013, IDT Corp. completed a spin-off

which formed Straight Path as an independent public company. Following the spin-off, IDT Spectrum became known as Straight Path Spectrum, Inc. ("Straight Path Spectrum" or "SPSI"). All of IDT Spectrum's FCC spectrum licenses (valued at $0 at the time of the spin-off) were transferred to and thereafter owned and held by Straight Path.

84.     During the Class Period, Straight Path remained subject to the control of Howard Jonas, whose Trust controls approximately 72% of the combined voting power of outstanding common stock of Straight Path. Mr. Jonas's consent is necessary regarding significant corporate matters which require shareholder approval, including but not limited to a merger or sale of assets.

### B.     The Acquisition, Failure to Develop, and Fraudulent Renewal of Straight Path's 39 GHz and LMDS Licenses

#### 1.     IDT Acquires and Fails to Develop Unconstructed Spectrum Licenses; Files False Substantial Service Notifications for Renewal

85.     The Winstar Licenses acquired by IDT in 2001 were initially set to expire on October 18, 2010, unless the licenses were developed and meeting substantial service requirements.

86.     Prior to IDT's acquisition of the Winstar Licenses, Winstar had not completed construction of the licenses sufficient to satisfy the FCC's substantial service requirements. As confirmed by orders of the FCC dated April 17, 2002, which approved the transfer of the Winstar Licenses to IDT/Winstar Holdings despite the fact that the substantial service requirements were not met (which is generally prerequisite to transfer/assignment of spectrum licenses under FCC rules), the FCC agreed to "waive Section 101.55 of our Rules to permit the assignment to Winstar Spectrum, LLC of the *unconstructed* LMDS and 39 GHz licenses held by the Winstar Licensees."

87.     In or around September 2007, having not yet constructed its LMDS licenses, IDT requested that the FCC waive the substantial service requirements applicable to its 16 LMDS spectrum licenses, or in the alternative, extend the deadline to show substantial service requirements.

88.     In or around April 2008, the FCC declined to waive the substantial service requirements required for renewal of the LMDS licenses, but granted IDT's request for an extension to show substantial service to June 1, 2012.

89.     Thereafter, in or around March 2008, having similarly not yet constructed its 39 GHz licenses, IDT requested that the FCC waive the substantial service requirements applicable to its approximate 931 39 GHz spectrum licenses, or in the alternative, extend the deadline to show substantial service requirements to June 1, 2012.

90.     In or around August 2008, the FCC declined to waive the substantial service requirements required for renewal of the 39 GHz licenses, but granted IDT's request for an extension to show substantial service to June 1, 2012.

91.     In granting IDT's request to extend the deadline for showing substantial service on its spectrum licenses, the FCC stated: "We authorize the Division to process in due course renewal applications for the stations that have received extensions. Any license that is renewed shall be subject to the condition that ***IDT Spectrum shall demonstrate substantial service by June 1, 2012. Failure to comply with that condition shall result in automatic termination of the license***."

92.     Thus, unless IDT could show that it met substantial service requirements by no later than June 1, 2012, the licenses would terminate automatically and IDT would not only lose any investment it had thus far made in the licenses, it would not be able to further develop the licenses, thus losing the potential to capitalize on the investment.

93.     IDT's Form 10-Q filed on March 17, 2009, stated that IDT "recorded impairment in the six months ended January 31, 2009 of $5.3 million, which ***reduced the carrying value of its licenses to zero*** … ***The Company estimated that these FCC licenses had nominal value*** based on continuing operating losses and projected losses for the foreseeable future."

94.     IDT further stated in its November 4, 2009 Form 8-K: "We reduced the carrying value of the FCC licenses from $5.3 million to zero because *we did not expect to be able to invest adequate cash in IDT Spectrum* in the near term in order to generate positive cash flow in the foreseeable future.…"

95.     Also in the November 9, 2009 Form 8-K, IDT announced that in October 2009, it had put the Winstar Licenses up for sale. IDT was apparently unable to find a buyer for the Winstar Licenses, as no such sale was announced in late 2009 or at any time in 2010.

96.     Thus, in or around October 2010 (just prior to the initial term expiration), IDT Spectrum proceeded to file FCC license renewals on approximately 623 of its 39 GHz licenses, thus establishing a new expiration date of October 18, 2020 for these licenses. IDT was still required to demonstrate substantial service no later than June 1, 2012 in order to secure these renewals.

97.     By 2012, however, the majority of the licenses still had not yet been developed at all, let alone substantially. Indeed, consistent with IDT's statements in 2009 that the Company did not expect to be able to invest adequate cash in its spectrum business – IDT's financial statements filed with the SEC during the 2008 to 2012 timeframe identify no construction expenses associated with the purported build-out, nor leasing expenses associated with the purported placement of spectrum equipment on third party property (as would be expected from the hub locations on third-party property as identified on the Substantial Service Notifications).

98.     Notwithstanding the foregoing, and apparently unable to find a buyer upon which to unload its licenses, in October 2010 – a mere year after IDT told the SEC and its investors that it had inadequate cash to support its spectrum business – IDT began the process of filing Substantial Service Notifications. These filings attested to the FCC that construction had been completed on *hundreds* of licenses and that "substantial service" was being "provided" to tens of millions of

people. In all, Substantial Service showings for at least 623 of the approximate 828 39 GHz licenses

at issue in this litigation were filed between October 2010 and October 2011.

> **2.     IDT's Rapaport Separately Obtains Unconstructed Spectrum Licenses; Files False Substantial Service Notifications for Renewal**

99.     In **May 2012**, Rapaport's Spectrum Holdings acquired approximately 200 largely

unconstructed 39 GHz spectrum licenses from unaffiliated telecommunications companies PTPMS

Communications, LLC ("PTPMS") and Telcove FWL, Inc. ("Telcove," a subsidiary of Level 3

Communications, Inc.), which licenses also **faced expiration on June 1, 2012**, if substantial service

requirements were not met (the "Rapaport Licenses").

100.     On or about May 29, 2012, Rapaport purchased a total of 22 unconstructed LMDS

and 39 GHz licenses from PTPMS for a mere $100.

101.     On or about May 31, 2012, Rapaport purchased a total of 178 largely unconstructed

LMDS and 39 GHz licenses from Telcove for a total of approximately $202,000.

102.     In connection with the purchase and transfer of these licenses to Rapaport's Spectrum

Holdings, which transfers were subject to FCC approval, the transfer applications represented that

Spectrum Holdings, through IDT, had the capabilities to "satisfy FCC construction requirements."

103.     The transfer of the Rapaport Licenses to Spectrum Holdings received FCC approval

between May 30, 2012 and June 1, 2012.

104.     Upon obtaining these approximate 200 LMDS and 39 GHz licenses, Rapaport and

Spectrum Holdings scrambled to file renewal applications and Substantial Service Notifications,

which purported to demonstrate that these previously unconstructed licenses had all suddenly

achieved substantial service *in a matter of days*.

105.     The control of the Rapaport Licenses became the subject of litigation between

Rapaport's Spectrum Holdings and IDT/IDT Spectrum, with IDT and Howard Jonas insisting that

Rapaport misappropriated the licenses and that IDT was the rightful owner of the Rapaport Licenses. That litigation was settled in or around June 2013. As an apparent result of the settlement between Spectrum Holdings and IDT Spectrum, Straight Path was assigned the Rapaport Licenses, in exchange for certain payments by Straight Path to Rapaport. These 200 licenses, worth an aggregate $203,000, came to account for approximately one-fourth of Straight Path's total license holdings during the Class Period.

### 3. The Timing of Filing of the Substantial Service Notifications Supports the Conclusion That the Licenses Were Not Actually Constructed As Represented

106. From the period March 2011 through June 2012 – the final 15 months preceding the cut-off date to show substantial service, and *after IDT stated that it "did not expect to be able to invest adequate cash" in its spectrum business* – Substantial Service Notifications were filed for approximately 947 of Straight Path's total 961 (over 98.5%) 39 GHz and LMDS licenses.

107. Of these, Substantial Service Notifications for at least 186 of the Rapaport Licenses (acquired unconstructed at the tail-end of May 2012) were filed in June 2012, alone.

108. The sheer speed in which Substantial Service Notifications were filed for these previously unconstructed licenses supports the conclusion that the licenses either (i) were not actually constructed as represented and/or (ii) if anything was constructed, did not provide the "substantial service" as represented.

### 4. A Close Review of the Substantial Service Notifiications Supports the Conclusion That the Licenses Were Not Constructed As Represented

#### (a) The Hastily-Prepared Substantial Service Notifications Largely Appear to Be "Cut-and-Paste" Copies

109. Due in significant part to the failure to build-out equipment to substantially serve the BEAs covered by its licenses, as well as the expedited timeline by which the Substantial Service

Notifications were filed, numerous Substantial Service Notifications appear to amount to little more than a cut-and-paste job.

110.    For example, nearly *all* license renewal applications – regardless of whether the application pertained to a 39 GHz license or an LMDS license – contained the ***identical 20% safe harbor*** statement promulgated by the FCC for LMDS licenses and PMP services. Of the Substantial Service Notifications filed between March 2011 and June 2012, a mere 32 of Straight Path's 39 GHz licenses relied on the 4 links per million safe harbor for PTP services, which the FCC had promulgated for 39 GHz licenses.

111.    Further evidencing the pro forma nature of these hastily-prepared Substantial Service Notifications are forms that that contained obvious placeholders. For example, the Substantial Service Notification for certain licenses within the Las Vegas service area stated, in part:

> IDT Spectrum is moving forward expeditiously with construction of its 39 GHz facilities. IDT Spectrum has recently completed construction of a point-to-multipoint hub facility in the ***<<BEA Location>>*** BEA…
>
> As demonstrated below, IDT Spectrum clearly satisfies this safe harbor requirement for point-to-multipoint licensees. IDT Spectrum's System provides fixed wireless coverage to an estimated population of ***<<Covered_Population>>*** individuals out of a total population of ***<<Total_Population>>*** in ***<<BEA>>***. This level of signal coverage – approximately ***<<Coverage_in _Percentage>>*** of the population in this BEA – is well above the 20% threshold. Accordingly, the FCC should find that IDT Spectrum has demonstrated substantial service in ***<<BEA>>*** for licenses ***<<All_Call_Signs>>*** and should grant IDT Spectrum's request to renew these licenses for a full 10 year term.
>
> The hub is located at ***<<Hub_Location>>, <<City>>, <<State>> (<<Latitude>>,<<Longitude>>).***

(placeholders in original.)

112.    Similarly, IDT filed a Substantial Service Notification for certain licenses within the New York-New Jersey-Long Island service area reflecting clear cut-and-paste, stating as follows:

> IDT Spectrum has recently completed construction of two point-to-multipoint hub facilities ***in the San Francisco-Oakland-San Jose BEA – is this reference correct?.***

This IDT Spectrum Hub system (the "System") will be used to satisfy customer demand for high-speed, large-file transfers in rural areas and other portions of IDT Spectrum's coverage area where only low-speed Internet access is available. [***This may not be accurate for NY***]

***

The hub uses two Multiple Point to Mupltiple Point Communication Systems with 360 degree coverage. [***Is this accurate?'***]

(notations in original.)

113.    Moreover, while the vast majority of Substantial Service Notifications for Straight Path's 39 GHz licenses purport to be based upon the provision of PMP services, a close review of the applications reveals that the transmission equipment listed does not provide 360-degree coverage. For example, the Substantial Service Notification for the New York-New Jersey-Long Island area claimed to employ a PMP system covering a 14.9 mile 360-degree radius. However, it identified transmitter equipment (the "Digital Microwave XP4") that provides only one-directional *PTP service* over short distances; the manual for the Digital Microwave XP4 states: "The XP4 series of millimeter and microwave products are designed for ***short-haul***, high-reliability, easy-to install, low-cost ***point-to-point*** communication links." Indeed, the vast majority (if not all) of Substantial Service Notifications for Straight Path's 39 GHz licenses purporting to provide PMP service identified the XP4 (point-to-point, directional) transmitter as the supposed hub equipment providing 360-degree service.

>    **(b)    While Most Substantial Service Notifications Invoked the 20% Safe Harbor for PMP Services, Defendants Admitted That Straight Path Was Unable to Provide "Substantial" PMP Service**

114.    While the vast majority (approximately 95%) of Substantial Service Notifications for the Company's 39 GHz licenses were based upon the 20% safe harbor for PMP (point-to-multipoint) services (*see* ¶109, *supra*), Defendants' public statements reveal that ***Straight Path did not have PMP technology in place for most of its 39 GHz licenses during the Class Period***.

115.    Rather, Defendants often cited the development, construction, and implementation of PMP technology for 39 GHz licenses as a potential short-term growth opportunity for the Company during the Class Period, including, for example:

(a)    In the May 29, 2014 Form 8-K and investor presentation, Defendants reported that Straight Path's "Short Term" plans for "Back haul and Last mile" market opportunities included "PTP today" and stated "**39 PTMP in development**"

Straight Path plans for each phase of market growth

| | Short Term - Now<br>Point-to-Point & PMP |
|---|---|
| Opportunity | Back haul and Last mile |
| Market | WISPs, Wireless carriers |
| Availability | PTP today<br>39 PTMP in development |

(b)    Similarly, in the February 25, 2015 Form 8-K and investor presentation, Defendants identified the move from PTP technology to PMP technology as one source of "Potential Appreciation With New Technology (& Demand)" noting that PMP technology is "Currently Available in LMDS A [licenses]" and that PMP technology in "**39 GHz [licenses] Anticipated Within 18 months**"



**Potential Appreciation With New Technology (& Demand)**

STRAIGHTPATH

- **PTP ➔ PMP**
  - Great Operator Economics (1➔30 vs. 1➔1)
  - Great Spectrum Economics (Area vs. Path)
  - Common Carrier Cannot Compete (PTP only)
  - Currently Available In LMDS A; 39 GHz Anticipated Within 18 months

(c)    Also, in the March 12, 2015 conference call reporting 2Q 2015 earnings, Defendant Jonas stated: "We see substantial customer **interest in point-to-multipoint** applications

using our spectrum *if the hardware is available* at the right price and with the right functionality,

and *we believe that the opportunity is significant*. We are driving innovation in order to enhance the

underlying value of our assets."

116.    Defendant Jonas himself stated, during a July 20, 2015 interview with *The Wall Street*

*Transcript* that the Company was just then developing PMP technology for its 39 GHz licenses:

> *To date, the revenue has been focused primarily on point to point*. Point to point is
> basically just one fixed site to another fixed site. You could connect different
> buildings within a campus. You could connect different sites within a network for
> backhaul. *The trouble is that it can be very expensive* when you decide that you
> want to cover a number of different sites. Each site requires its own dedicated
> hardware, and the hardware is probably about 90% of the cost involved in the point-
> to-wireless network.
>
> *So our focus in terms of building up the revenue model is to lower the cost of the*
> *equipment,* thereby giving a greater opportunity for the spectrum to make money.
> *One way of doing that is using a point-to-multipoint technology.* Instead of having
> one dedicated piece of technology for each site, you can now have one dedicated hub
> or sector radio, and that radio can now serve up to 30 customers…. PMP economics
> make our spectrum a much more compelling option because point to multipoint can
> only be done in areawide licenses, such as ours, or unlicensed frequencies, which are
> highly unreliable.
>
> * * *
>
> *This PMP technology currently exists at LMDS*, where we have a much smaller
> footprint than the 39-gigahertz frequency where we cover every market in the
> country and own about 96% of the licenses. *We are planning to invest and bring*
> *PMP technology to 39*. Then, we expect we will see much more substantial revenue
> growth. And this will allow it to be rolled out across the country.

(emphasis added)

117.    Defendants' repeated discussion of the need to develop and invest in PMP technology

in the 39 GHz band during the Class Period strongly suggests that the PMP systems described in the

Substantial Service Notification Applications for at least 774 of Straight Path's claimed 828 39 GHz

licenses either: (i) did not exist or (ii) did not provide the "substantial service" claimed.

(c)     **The Substantial Service Notifications Identify Hub Locations That Appear to Lack the Requisite Equipment and Claim Signal Distances that Cannot Reasonably Be Reached**

118.    While none of the Substantial Service Notifications for Straight Path's licenses identify the location of any receiving antenna sites, they often identified transmitting antennas supposedly placed on third party property. A review of the street addresses and latitudinal/longitudinal coordinates identified in the Substantial Service Notifications filed for Straight Path's 39 GHz licenses reveal that the majority of the licenses' hub equipment purported to be constructed upon existing third-party commercial structures or even single family homes, with no apparent transmission equipment present, including, for example:

(a)     The hub location identified in the Substantial Service Notification for 39 GHz call sign WPQU268, in BEA095 (Jonesboro, AR) – spanning a purported 37.5 mile radius – is 534 West Washington Avenue, Jonesboro, AR (35.838754, -90.710184); this location appears to be a 2-story residential structure with no apparent sign of a tower or other transmission equipment:

 

(b)     The hub location identified in the Substantial Service Notification for 39 GHz call signs WPQU408, WPQV271, WPQV428, and WPQV457, in BEA110 (Grand Forks, ND) – spanning a purported 42.8 mile radius – is 3350 32nd Avenue South, Grand Forks, ND (47.890228, -

97.076686); this location appears to be a 3-story hotel called "Lakeview Inn & Suites" with no

apparent sign of a tower or other transmission equipment:



(c)     The hub location identified in the Substantial Service Notification for 39 GHz call

signs WPQU238 and WPQV216, in BEA004 (Burlington, VT) – spanning a purported 24.6 mile

radius – is 2572 Shelburne Road, Shelburne, VT (44.418296, -73.213861); this location appears to

be a 2-story "Quality Inn" hotel with no apparent sign of a tower or other transmission equipment:



(d)     The hub location identified in the Substantial Service Notification for 39 GHz call

signs WPQU232 and QPQV297, in BEA165 (Redding, CA) – spanning a purported 53.9 mile radius

– is 1135 Market Street, Redding, CA (40.588213, -1222.391921); this location appears to be a 2-story "Deluxe Inn" hotel with no apparent sign of a tower or other transmission equipment:



(e)      The hub location identified in the Substantial Service Notification for 39 GHz call signs WPQU211 and WPQU948, in BEA120 (Grand Island) – spanning a purported 36.5 mile radius – is 3404 West Faidley Avenue, Grand Island, NE (40.924934, -98.379248); this location appears to be a 3-story Holiday Inn Express & Suites hotel with no apparent sign of a tower or other transmission equipment:




(f)      The hub location identified in the Substantial Service Notification for 39 GHz call signs WPQU958 and WPQV286, in BEA142 (Scottsbluff) – spanning a purported 46.4 mile radius – is 1821 Frontage Road, Scottsbluff, NE (41.868071, -103.639633); this location appears to be a 3-

story Holiday Inn Express & Suites hotel with no apparent sign of a tower or other transmission equipment:

 

119.    As reflected above, the Google image views of these locations reveal no tower or other structure sufficiently tall to provide the signal distance claimed in the Substantial Service Notifications (*see also* ¶40, *supra*, regarding distance to radio horizon at various heights).

120.    Indeed, many Substantial Service Notifications claimed unreasonable distances covered by 360-degree PMP systems, and which extended well beyond the maximum estimated distance to the radio horizon. The following table includes but a few examples comparing Straight Path's claimed radii to the distance to the radio horizon:

| BEA (39 GHz) | approx. height of only discernable structure at hub location | radius claimed | approx distance to radio horizon at given height (*see* ¶40, *supra*) |
|---|---|---|---|
| BEA165 (Redding, CA) | 20 feet (approx. 2-story building) | 53.9 miles | 5.5 miles |
| BEA121 (North Platte, NE) | 20 feet (approx. 2-story building) | 52.8 miles | 5.5 miles |
| BEA142 (Scottsbluff, NE) | 30 feet (approx. 3-story building) | 46.4 miles | 6.7 miles |
| BEA114 (Aberdeen, SD) | 30 feet (approx. 3-story building) | 46.4 miles | 6.7 miles |
| BEA021 (Greenville, NC) | 40 feet (approx. 4-story building) | 46.7 miles | 7.8 miles |
| BEA118 (Omaha, NE) | 40 feet (approx. 4-story building) | 46.4 miles | 7.8 miles |
| BEA110 (Grand Forks, ND) | 20 feet (approx. 2-story building) | 42.8 miles | 5.5 miles |
| BEA168 (Pendleton, OR) | 40 feet (approx. 4-story building) | 41.0 miles | 7.8 miles |
| BEA014 (Salisbury, MD) | 50 feet (approx. 5-story building) | 41.8 miles | 8.7 miles |
| BEA095 (Jonesboro, AR) | 20 feet (approx. 2-story building) | 37.5 miles | 5.5 miles |

| BTA (28 GHz) | | | |
|---|---|---|---|
| BTA412 (Scranton-Wilkes Barre-Hazleton, PA) | 20 feet (approx. 2-story building) | 45.9 miles | 5.5 miles |
| BTA030 (Bangor, ME) | 20 feet (approx. 2-story building) | 45.9 miles | 5.5 miles |
| BTA471 (Wheeling, WV) | 20 feet (approx. 2-story building) | 45.9 miles | 5.5 miles |
| BTA201 (Hyannis,MA) | 30 feet (approx. 3-story building) | 45.9 miles | 6.7 miles |
| BTA265 (Lufkin-Nacogdoches, TX) | 30 feet (approx. 3-story building) | 45.2 miles | 6.7 miles |
| BTA339 (Paducah-Murray-Mayfield, KY) | 30 feet (approx. 3-story building) | 45.2 miles | 6.7 miles |
| BTA219 (Jonesboro-Paragould, AR) | 30 feet (approx. 3-story building) | 45.2 miles | 6.7 miles |
| BTA361 (Poughkeepsie-Kingston, NY) | 40 feet (approx. 4-story building) | 45.9 miles | 7.8 miles |
| BTA043 (Binghamton, NY) | 40 feet (approx. 4-story building) | 45.9 miles | 7.8 miles |
| BTA370 (Reading, PA) | 50 feet (approx. 5-story building) | 45.9 miles | 8.7 miles |

121.    ***Straight Path itself recognized*** – albeit long after the Substantial Service Notifications were filed – that "***[d]ue to propagation characteristics, the 39 GHz and LMDS bands are best suited for small cells with radii not exceeding 1 kilometer***." *See In the Matter of Use of Spectrum Bands Above 24 GHz For Mobile Radio Services, et al.*, Comments of Straight Path Communications, Inc. (January 15, 2015), at pp. 5-6 (emphasis added).

122.    Moreover, as alleged in ¶96, *supra*, and ¶¶133-34 *infra*, no lease payments for the use of these locations appear to have been made either by Straight Path during the Class Period, or by its predecessor company, IDT.

> **(d)    The Substantial Service Notifications Claim Inflated Service Coverage Based upon Unreasonable Underlying Assumptions**

123.    As set forth above, the maximum distance a PMP signal can reach depends on a variety of factors, including, transmitter height, frequency (higher-frequendy signals generally are able to travel shorter distances), transmitter and receiver power, antenna gain, and natural signal degradation due to RainFade and Free Space Path Loss. The Substantial Service Notifications for Straight Path's 39 GHz licenses include a number of unreasonable underlying assumptions with

regard to these factors that support the conclusion that the systems, *if* ever even constructed, would not have provided the "substantial service" to which the applications attested.

124.    Transmitter power is generally understood as the amount of energy pushed into the transmitter to send a signal. The Substantial Service Notifications for Straight Path's 39 GHz licenses almost uniformly claimed to employ 33 dBm (milliWatt decibels) of power.  This amount is unreasonably low for the systems described in the applications, which purported to provide 360-degree coverage over radii spanning 30 miles and more.

125.    As indicated above, the vast majority, if not all, of the Substantial Service Notifications for Straight Path's PMP license systems claim full, uninterupted, perfect 360-degree circles of coverage emanating from the hub. This lack of variability of signal availability and strength over 360-degree distances spanning as far as 30 to 50 miles is highly unrealistic.

126.    Moreover, the transmitting and receiving "gain" claimed on the Substantial Service Notifications for Straight Path's 39 GHz licenses is untenable for the 360-degree PMP systems described in the applications. While the applications claimed to utilize very-high gain antennas to increase signal strength (thus indicating very highly directionalized antennas), the gain claimed in the filings would *only help maximize signal strength in one direction* – not the 360-degree coverage claimed on the applications for Straight Path's 39 GHz licenses. As a result, the supposed covered radii claimed on the Substantial Service Notifications were falsely overstated, thus inflating the purported population covered.

127.    Not only are signals at these high frequencies unable to reliably travel across the vast distances claimed, legitimate showings of substantial service under a PMP license should account for some variability in signal strength even within reasonable distances, and some areas that may receive no coverage at all. *Compare*, for example, the following coverage maps provided by Straight Path

(which are virtually the same for all of its licenses operating PMP systems) *with* those provided by competitors Nextlink and NextWave identifying the areas of "reliable" signal coverage:





128.    Both Nextlink and NextWave accounted for service variability in their Substantial Service Notifications. NextWave's service varaiability can be discerned from the area marked in orange on the above map, while Nextlink stated: "signal strength in the BEA varies from a maximum strength of 48.2 dBm to no less than -89.5 dBm."

129.     Finally, the supposed throughput listed on the majority of the Substantial Service

Notifications for Straight Path's 39 GHz licenses – 1 mBit per second – is senseless. For example,

basic home Internet service providers commonly provides throughput up to 100 mBits per second.

Straight Path's 1 mBit per second can hardly be said to surpass any level of "mediocre" service, let

alone to provide "substantial" service to the high percentages of population claimed. To be sure; if

Straight Path had in fact provided "substantial" service, radius reached, and thus the number of

people covered, would have necessarily been *much* smaller.

(e)     **Numerous Substantial Service Notifications Were Amended and Re-Filed Shortly After Filing to Reflect Increased Coverage Based Upon Unreasonable Asumptions**

130.     Moreover, many of Straight Path's Substantial Service Notification applications were

amended shortly after initial filings, purportedly claiming to serve vastly increased populations based

upon unexplained changes in underlying service assumptions (*i.e.*, prediction variables including

Rain Fade and Free Space Path Loss) and greatly expanded service radii, with no increase in power,

and no apparent change in or additions to equipment:

| service area | initial radius | revised radius | initial population covered | revised population covered | initial % covered | revised % covered |
|---|---|---|---|---|---|---|
| Tampa-St. Petersberg-Clearwater | 11.2 miles | 31.1 miles | 616,401 | 2,211,962 | 25.73% | 92.32% |
| Greenville | 18.6 miles | 48.7 miles | 54,847 | 179,084 | 21.74% | 70.99% |
| Lafayette | 14.6 miles | 35.8 miles | 201,714 | 495,898 | 33.53% | 82.42% |
| Biolxi-Gulfport-Pacagoula | 14.6 miles | 35.8 miles | 169,347 | 353,683 | 42.68% | 89.14% |
| Dothan | 13.5 miles | 37.2 miles | 69,024 | 211,761 | 20.76% | 63.70% |
| Miami-Fort Lauderdale | 11.2 miles | 31.1 miles | 1,136,429 | 3,412,646 | 20.29% | 60.92% |
| Fort Myers-Cape Coral | 14.6 miles | 35.8 miles | 355,009 | 613,871 | 51.28% | 88.68% |
| Baton Rouge | 14.6 miles | 35.8 miles | 394,288 | 659,957 | 53.31% | 89.22% |
| Sarasota-Bradenton | 14.6 miles | 35.8 miles | 403,302 | 645,930 | 52.80% | 84.57% |

| Albany | 14.6 miles | 39.9 miles | 104,778 | 238,927 | 22.38% | 51.03% |
|---|---|---|---|---|---|---|
| Mobile | 18.6 miles | 41.2 miles | 351,631 | 526,121 | 52.00% | 77.80% |
| Pensacola | 14.6 miles | 35.8 miles | 299,558 | 440,867 | 48.06% | 70.74% |
| Orlando | 11.6 miles | 32.2 miles | 826,220 | 1,617,629 | 22.68% | 44.41% |
| Birmingham | 14.6 miles | 35.8 miles | 570,809 | 903,970 | 36.15% | 57.25% |
| Jacksonville | 13.5 miles | 33.3 miles | 639,151 | 1,018,295 | 33.90% | 54.02% |
| Montgomery | 13.5 miles | 33.2 miles | 237,131 | 328,961 | 49.29% | 68.37% |
| Tallahassee | 14.6 miles | 35.8 miles | 199,465 | 332,509 | 27.69% | 46.15% |
| Little Rock-N. Little Rock | 13.5 miles | 37.2 miles | 336,524 | 605,300 | 20.84% | 37.48% |
| New Orleans | 13.5 miles | 33.3 miles | 957,711 | 1,212,455 | 55.51% | 70.27% |
| Jackson | 13.5 miles | 37.2 miles | 312,013 | 467,680 | 21.78% | 32.65% |

131.    There is nothing apparent in the Substantial Service Notifications to justify these significant increases in covered population. For example, there was no change in power or antenna gain that would theoretically enchance signal strength. The only possible explanation that *could* explain *some* increase in coverage could have been increased transmittor or receiver height – which would have necessitated the construction of towers; but of course, there is no evidence of any such construction ever having occurred.

### 5.    IDT Spectrum Becomes Straight Path Spectrum in July 2013 Spin-Off; Straight Path Further Fails to Construct the Licenses

132.    When IDT Spectrum became Straight Path Spectrum in the spin-off from IDT Corp. on July 31, 2013, all of the active licenses held by IDT Spectrum, as well as the Rapaport Licenses, were transferred to (and at all relevant times thereafter were held by) Straight Path. However, as alleged above, Straight Path did not inherit built-out systems that actually met "substantial service requirements" necessary for valid license renewal. Moreover, following the transfer of licenses to Straight Path, Straight Path likewise failed to build-out equipment to serve the BEAs covered by its licenses, much less to meet substantial service requirements for license renewal.

133.    In fact, none of Straight Path's quarterly or annual reports filed with the SEC during the Class Period reflect build-out costs sufficient to meet substantial service requirements. For

example, Straight Path reported in its 2015 annual report filed with the SEC on Form 10-K that for

the Straight Path Spectrum Segment, its "direct cost of revenues" was $0 for fiscal year 2015,

$29,000 for fiscal year 2014, and $53,000 for fiscal year 2013. According to Straight Path, these

direct costs of revenue "include[] governmental fees and connectivity costs." Nowhere else in

Straight Path's Form 10-Ks for 2013, 2014, or 2015 is there any indication of build-out expenditures

or investments associated with construction of its spectrum licenses.

134.     Moreover, Straight Path reported a negligible amount of rent for placement of

spectrum telecom equipment *on a single roof*.  The Company's FY 2015 Form 10-K stated:

> the Company currently leases space on a roof for some of its telecom equipment as
> part of its Spectrum operations. The monthly rental is $600 and continues on a
> month-to-month basis until terminated by either party with 30 days' notice.

> [and]

> Effective August 1, 2013, the Company began leasing space on a roof for some of its
> telecom equipment as part of its Spectrum operations. The monthly rental was $120
> through March 2014 and $600 thereafter….

135.     Despite the foregoing single roof lease disclosed in connection with the placement of

spectrum equipment (that had ostensibly been in place since August 1, 2013), Straight Path's FY

2013 10-K and FY2014 10-K, disclosed no such lease in connection with its spectrum business.

Rather, Defendants stated that the Company had " no future contractual obligations or other

commercial commitment" as of the end of each fiscal year, other than lease agreements for its

corporate headquarters located in Richmond, Virginia and a satellite office located in Englewood

Cliffs, New Jersey.

136.     Further supporting the conclusion that Straight Path neither inherited constructed

systems nor constructed its licenses to satisfy substantial service requirements itself, Straight Path

tacitly admitted that its licenses were not constructed (or were not sufficiently constructed) to meet

substantial service requirements, stating in its 2013, 2014, and 2015 10-Ks: "We currently lease Spectrum and provide related services to internet service and telecommunications providers and other companies that prefer to buy their own equipment and design their own fixed wireless networks for last mile, mid-mile, fixed accesss, and backhaul applications and *have the staff and operational systems to support a buildout*."

### C.   The Truth About Straight Path's Supposedly Valuable Licenses Emerges

137.   On October 29, 2015, Kerrisdale Capital published a report entitled, "Straight Path Communications Inc. (STRP) The Next Generation of Overblown Spectrum Hype" (the "Kerrisdale Report"). The Kerrisdale Report questioned the commercial viability of Straight Path's spectrum licenses, especially as related to the viability of Straight Path's supposed plan to serve the 5G market with its microwave spectrum licenses, and provided the following summary:

> **5G ≠ mmWave.** Straight Path enthusiasts tend to mix up distinct concepts, speaking as if every new announcement about "5G" – like Verizon's – necessarily involves mmWave. *But many key aspects of the nascent 5G vision have nothing to do with high-frequency spectrum at all.* New air interfaces and massive MIMO, for instance, are technologies that can greatly enhance throughput in the bands already used for 3G and 4G, as well as low-frequency bands to be rolled out in the future, like the 600MHz band, which FCC Chairman Tom Wheeler described in August as "a prime candidate for deployment of a wide-area 5G coverage layer." In early October, the Chinese equipment vendor Huawei and the Japanese carrier NTT DOCOMO "announced…the world's first successful large-scale field trial of 5G new radio access technologies," including Sparse Code Multiple Access and Filtered OFDM, achieving peak downlink throughput of 3.6 gigabits per second (Gbps). But this trial didn't use mmWave: the press release clearly states that it used "the sub-6GHz frequency band." *Indeed, the first commercial deployments of 5G – whenever they occur – are widely expected to use conventional bands, not mmWave.*

> 5G is also about far more than just higher throughput for smartphones. Key players see it primarily as a platform for communicating with large numbers of distributed sensors (the "Internet of Things") and other machines, like driverless cars, that may require extremely low latencies and high reliability but not necessarily large quantities of data. (Driverless cars, for instance, are not going to be watching lots of ultra-high-resolution video.) *For these crucial and novel use cases at the heart of 5G planning, mmWave is irrelevant.* Indeed, Verizon's own promotional video about its 5G efforts emphasizes the Internet of Things and features the company's

vice president of network planning stating (at 0:54) that "people have enough throughput for the kinds of services they're performing today on the mobile network" – hardly an indication that enormous amounts of mmWave bandwidth will come in handy any time soon.

**Straight Path's spectrum is just one tiny drop in the mmWave bucket.** *Straight Path likes to point out (see slide 6) that it holds "96% of active 39GHz FCC licenses"; credulous listeners interpret this as a monopoly on "5G spectrum." Yet the company's 828 39GHz licenses comprise just 34% of the total 2,450 licenses that were up for bid at the FCC's 2000 auction. The explanation is that so many of the companies that attempted to use the 39GHz band gave up, went out of business entirely, or ran into trouble with the FCC that large numbers of licenses across the country were voluntarily canceled or forcibly terminated.* (Indeed, Straight Path itself, in its previous identity as IDT Spectrum, canceled 298 of its 39GHz licenses in 2010 – almost a third of the portfolio it had acquired out of the Winstar bankruptcy.) Based on the FCC's recently released <u>Notice of Proposed Rulemaking</u> (NPRM), *these unused licensed will ultimately be reauctioned to the public, thereby completely circumventing Straight Path*.

But the future sale of a large amount of 39GHz spectrum not held by Straight Path is just a small part of a very large problem: *the only reason to use mmWave bands at all is because there is so much spectrum available there*. Without this vast supply, research into mmWave mobile broadband might be an interesting academic problem but would be an obvious commercial non-starter given all the immense and as yet unsolved technical difficulties. The only practical reason to bother is the prospect of accessing huge blocks of spectrum, which regulators around the world are beginning the process of freeing up. From a technological perspective, there is nothing special about Straight Path's 39GHz band as opposed to the many other mmWave bands, including several that either are or are likely to become unlicensed and thus free to use.

The chart below illustrates the size (in gigahertz of bandwidth) of the mmWave bands most likely to be repurposed for mobile use in the medium term, putting Straight Path's holdings in perspective:



CITEL/CEPT/APT/RCC are regional regulatory bodies for the Americas/Europe/Asia/Eurasia, respectively.
Note: "FCC NPRM bands" includes the 60GHz band (57-64 GHz) already available for unlicensed use.
Source: DIGITALEUROPE summary of regional proposals, mmWave NPRM, Kerrisdale analysis

Above, on the left, we show the aggregate amount of high-frequency bandwidth proposed for consideration as future homes for mobile broadband by various regional regulatory bodies, including CITEL, the Inter-American Telecommunication Commission, of which the FCC is a member. These proposals will be further discussed at the upcoming World Radiocommunication Conference (WRC) in November and finalized in 2019. We also show the total size of the bands in the FCC's recent NPRM, including the existing 60GHz band, already available for unlicensed use, including mobile. But these bands are only the first step – FCC Chairman Tom Wheeler has already publicly pledged to consider others in the near future. With 20 to 30 GHz in sight, ***Straight Path's nationwide average of 817 MHz, including 691 MHz in the 39GHz band and 126 MHz in the LMDS band, looks trivially small.*** (Even that total is overstated since much of the LMDS band is excluded from both the NPRM and the international proposals.) ***Far from a mmWave monopoly, Straight Path's holdings amount to a drop in the bucket***. Anyone interested in using mmWave spectrum will have an embarrassment of riches.

Moreover, the supply is likely to grow further, from tens to hundreds of gigahertz, a point ably made in 2011 by two of the mmWave researchers then at Samsung, one of whom went on to become Straight Path's chief technology officer. They argued that there was 252 GHz of readily usable bandwidth between 3 and 300 GHz, and that even if only 40% could be unlocked for mobile networks, it would amount to "more than 200 times the spectrum currently allocated for this purpose below 3GHz."



Indeed, one of the benefits of mmWave technology that the Samsung mmWave group has often pointed out is that there's so much spectrum for the taking that even exclusive access will be incredibly cheap – potentially good news for carriers and consumers but not spectrum owners like Straight Path.

In keeping with the absence of any compelling reason to prefer Straight Path's spectrum to other similar bands, recent 5G demos have focused elsewhere. For example, back in July 2014, Ericsson, in collaboration with NTT DOCOMO and SK Telecom, demonstrated 5Gbps speeds using the 15GHz band. In March, NTT DOCOMO and Nokia achieved a speed of 4.5 Gbps using the 70GHz band. In April,

at the Brooklyn 5G Summit, Nokia <u>demonstrated</u> "a 10 Gbps peak rate system over the air at 73 GHz." Consumer products using the large, unlicensed 60GHz band via the WiGig protocol already exist. In short, mmWave spectrum will be a commodity in vast supply, and Straight Path has nothing special to offer. In fact, because Straight Path's 39GHz holdings consist of scattered 50MHz units, not the very wide contiguous channels sought after by industry participants, it's difficult to see how, without significant favors granted by the FCC, it will ever be practical to use its spectrum for 5G.

**<u>mmWave spectrum has fundamental limitations that, even if technology improves, will sharply restrict its usefulness.</u>** To be sure, major companies have developed prototypes and simulations showing that sophisticated antenna arrays using very wide bandwidths can overcome some of the propagation problems of the mmWave bands. But it's a long way from large, clunky prototypes to real-world networks and user devices. In particular, even if signals can reliably achieve targeted ranges on the order of hundreds of meters, they will still suffer from enormous losses when going from outside to indoors – orders of magnitude worse than conventional cellular frequencies, many of which already struggle with in-building penetration. ***Since <u>approximately 80% of cellular usage is indoors (almost always using signals transmitted from outside), the practical applications of mmWave technology will be few and far between.</u>*** mmWave handsets also face severe challenges since the user's head and fingers can easily block the narrow beams used by mmWave signals, potentially requiring multiple duplicate antenna arrays on different sides of the handset. High power consumption is also a problem. ***Perhaps most dauntingly, mmWave networks will require extremely high basestation densities, thousands of times higher than existing networks, implying enormously costly and timeconsuming buildouts for no clear economic benefit.*** It's no wonder that the CEO of one Hong Kong-based carrier <u>dismissed</u> 5G as the creation of "equipment vendors…asking us to plow more money in there for a purpose that is not yet entirely clear….You don't need that much bandwidth."

**<u>Valuation precedents and benchmarks imply that Straight Path's spectrum is worth >90% less than its current market cap.</u>** Even if we ignore the shortcomings of Straight Path's spectrum, the likelihood that mmWave networks will simply never be deployed on a large scale, and the vast supply of highly similar competing spectrum, Straight Path is still worth very little. For example, based on the price at which Level 3, a large, savvy telecom firm, was willing to sell 39GHz and LMDS licenses in 2012 – just $203,000 for more than 46 billion MHz-pops – Straight Path's entire portfolio is worth just $1 million. Attempting to extrapolate from dollar-per-MHz-pop levels paid for conventional cellular spectrum but adjusting for the vastly higher cost of deploying the extremely dense network that mmWave would require generates an estimated value of approximately $40mm – more than 90% below the current market cap. Simply put, Straight Path is a bubble, driven by hype, misconceptions, and wishful thinking.

(combined bold/italic emphasis added, all other emphasis in original).

138.    On this news, the Company's shares fell $18.23 per share, or over 38%, to close at

$29.35 per share on October 29, 2015, damaging investors.

139.    Then, the Sinclair Report was published on November 5, 2015, asserted that the

Company's 39 GHz licenses were renewed only after the Company made fraudulent representations

to the FCC. The Sinclair Report stated, in part:

> There is overwhelming evidence that the vast majority of Straight Path
> Communications' ("Straight Path") 39 GHz spectrum licenses' Required Notification
> of Construction/Coverage Applications were **obtained under fraudulent
> misrepresentation, because the systems were never built on the sites as specified in
> the filings**.
>
> Michael Rapaport, as a representative of IDT Spectrum and Spectrum Holdings
> Technologies ("IDT"), the transferors of Straight Path's 39 GHz licenses, has likely
> committed over 150+ counts of fraud against the US government and made a
> mockery of the FCC's trust-based license renewal process. Instead of spending vast
> amounts of time, money, and resources to actually building up the required 39 GHz
> wireless sites in the 173 Basic Economic Areas (BEA) across the country,
> **IDT/Rapaport gamed the system by filing construction/coverage substantial service
> Required Notifications that would pass FCC renewal process with nothing but a
> word processor**.
>
> Almost all of the 39 GHz systems that are claimed to be "constructed" by IDT to
> provide Substantial Service as required for their 39 GHz license renewals in 2011-
> 2012, cannot possibly been able to meet their performance specifications, as their
> purported systems defy the laws of physics, geometry, economics, and common
> sense. Readers, investors, and the FCC can easily verify for themselves that **IDT's
> systems were never built or operating at the time of renewal**.

140.    The Sinclair Report further explained the fraudulent scheme as follows:

> In early 2011, IDT Spectrum, LLC ("IDT") a subsidiary of IDT Corporation, had a
> big problem and it needed a solution, and it needed it fast. At that time, IDT owned
> 931 licenses in the 39 GHz spectrum and those licenses would expire and be
> terminated by June 1, 2012, unless IDT could show that it met the substantial service
> requirements of Section 101.17(a). If IDT did not meet those requirements, they
> would not be able to keep those licenses until the next expiration date of October 18,
> 2020, which would cost them their investment in those licenses.
>
> Under FCC renewal requirements for each license, IDT had to show that they
> constructed systems to either 1) broadcast 39 GHz signals with 4 point-to-point links

per 1 million population within each county-sized Basic Economic Area (BEA) service areas or 2) under the point-to-multipoint safe harbor established for LMDS provide coverage to 20 percent of the population of the license's BEA service area. For each BEA, there are 14 licenses consisting of 100 MHz Channels between 38.6-40.0 GHz. However, leasing the sites for the systems, building the hardware, and operating the radio and antennas in all 173 BEAs across all 50 states would cost a lot of money, at least $10-12 million dollars by another (now bankrupt) spectrum holder company's estimates.

Enter Michael Rapaport.

Rapaport, former president of IDT Spectrum, LLC, came up with a working, but illegal solution. First, IDT would build 1 actual, real system (we believe this is the system covering San Francisco-Oakland-San Jose in BEA163 filed on 7/28/10), get it renewed by the FCC, and use that paperwork as a template to make fillings in all the other 172 BEAs. This is acceptable, if IDT actually built the systems.

***But, IDT did not actually build most, if not all of the other 172 systems as required, but still filed the Required Notification of Construction/Coverages falsely asserting that they did build them***. The FCC, lacking the manpower to inspect each and every application, and having a trust-based license renewal process, approved those licenses for renewal, and IDT got almost all of their licenses renewed cross-country. This was quite unusual, because the other large holders of 39 GHz licenses (FiberTower, Airband), attempted to renew but still failed to meet the substantial service requirements and let their licenses expire.

In mid-2012, IDT and Rapaport had another similar problem. Rapaport, through his company Spectrum Holdings Technologies, LLC ("Spectrum Holdings"), acquired 200 licenses in 39 GHz from Level 3 and PTPMS Communications in 122 BEAs that were about to expire because the substantial service requirements were due on June 1, 2012. Spectrum Holdings was assigned ownership of these licenses on May 31, 2012. ***Amazingly, after just 12 days after getting the licenses, by June 12, 2012, Spectrum Holdings filed their Notifications of Construction/Coverage for every license***. How did Spectrum Holdings build up systems in every state in the country in just 12 days? The answer is, they didn't. Spectrum Holdings simply used the same template as IDT, used find/replace in a word processor to change IDT to Spectrum Holdings, left the rest of the specifications and locations of the site exactly the same, and got these new licenses approved. Problem solved. In 2013, Spectrum Holdings assigned their licenses to Straight Path Communications, who also now owns the former IDT Spectrum licenses.

***The FCC is very clear on the requirements for construction/coverage and substantial service, it is not a theoretical exercise for potential or hypothetical signals coming from a proposed system. At the time of the filing, the system must be broadcasting and operational***.

141.    The Sinclair Report further stated that:

In this report, we show evidence that ***many, if not all of the 39 GHz system sites that IDT/Spectrum/Straight Path purported to build were never built nor operating to the required performance specifications to meet substantial service***. We were not able to check or prove that each and every site was fictional. However, because we believe almost every single Required Notification filing was fraud, we are confident that anyone who investigates a random sample of 10 sites purported to be built will discover the truth that they never existed.

142.    The Sinclair Report included a number of specific examples upon which the author based the conclusion that many of Straight Path's 39 GHz licenses were not actually constructed. For example, using Google Earth, the author was able to view the exact latitudinal and longitudinal coordinates of certain sites at which IDT claimed to have built towers – and the photographs showed no evidence of any radio or cell tower construction, as claimed in documents submitted to the FCC:



Source: Google Maps Street View, location (42.563362, -114.479642)

here are no buildings around higher than 5 stories tall, no cell phone towers are large structures to lace an antenna. But, to get a radius of 33.5 miles, IDT would have to put the antenna 750 feet high, or 5 stories, above the ground. Maybe IDT built a really tall tower on top of the supermarket or Jiffy Lube earby?



Source: Google Maps Street View, location (41.105006, -100.762986)

If you pan around, you can see that all the buildings are 1 story tall (15 feet), and there are no cell phone towers or tall structures over 5 stories tall in the immediate vicinity. Giving IDT the benefit of the doubt, even if IDT's site location was mistyped and they didn't build a tower on top of the Overland Trails Boy Scouts Service Center, the maximum height of the antenna is around 75 feet tall. We checked a random sampling of multiple sites that IDT claims to be built, and never found any evidence that systems were built (except for the San Fran and New York exceptions).

143.    The Sinclair Report also included a detailed description of why the purported signal radius claimed in many of the Substantial Service Notifications, and particularly the hub purported to exist at the Overland Trails Boy Scouts Service Center, was false:

> If you pan around, you can see that all the buildings are 1 story tall (15 feet), and there are no cell phone towers or tall structures over 5 stories tall in the immediate vicinity. However, in the filing the signal range radius claimed by IDT is 52.8 miles. This is from an antenna powered at 33 dBm, or 2 watts. To compare, a normal cell phone device has power of 1-2 watts. A really tall cell tower has a max range 45 miles but using 10 watts and at under 3 GHz frequencies. Could IDT really have transmitted at 1/10 the power level of a cell phone tower a signal at 1 Mbit/second 52.8 miles away?

> If you pan around, you can see that all the buildings are 1 story tall (15 feet), and there are no cell phone towers or tall structures over 5 stories tall in the immediate vicinity. Giving IDT the benefit of the doubt, even if IDT's site location was mistyped and they didn't build a tower on top of the Overland Trails Boy Scouts Service Center, the maximum height of the antenna is around 75 feet tall. We checked a random sampling of multiple sites that IDT claims to be built, and never found any evidence that systems were built (except for the San Fran and New York exceptions).

> This is relevant, because at 75 feet high, the maximum distance to the horizon is only 10.6 miles. However, in the filing the signal range radius claimed by IDT is 52.8 miles. This is from an antenna powered at 33 dBm, or 2 watts. To compare, a normal cell phone device has power of 1-2 watts. A really tall cell tower has a max range 45 miles but using 10 watts and at under 3 GHz frequencies. Could IDT really have transmitted at 1/10 the power level of a cell phone tower a signal at 1 Mbit/second 52.8 miles away?

> Unless IDT built an 1,845 foot tall structure (50% higher than the Empire State Building!) and placed their transmitting antenna on top of it, it was impossible for IDT to provide substantial service in 39 GHz for this site at a 52.8 mile radius around

it. If the antenna was only 75 feet tall, and the coverage radius is decreased to 10.6 miles, the much smaller area could cause the population covered to fall below 20% of the area and the license to be rejected for renewal. We believe this is further evidence that IDT was gaming the system by stating coverage radii that are so large to be completely unrealistic just to get the license renewed.

144.    The Sinclair Report also identified repeated instances of apparent "cut-and-paste" of information between applications, namely from IDT's application for one area where a license may have actually been built-out, San Francisco-Oakland-San Jose area (BEA163). For example, an application relating to a New York-New Jersey-Long Island service area referenced satisfying customer demand in San Francisco and referred to rural area coverage.[5]

> Even with this extension, IDT Spectrum is moving forward expeditiously with construction of its 39 GHz facilities. IDT Spectrum has recently completed construction of two point-to-multipoint hub facilities in the San Francisco-Oakland-San Jose BEA – is this reference correct?. This IDT Spectrum hub system (the "System") will be used to satisfy customer demand for high-speed, large-file transfers in rural areas and other portions of IDT Spectrum's coverage area where only low-speed Internet access is available. [This may not be accurate for NY]

Source: Substantial Service Application for IDT Spectrum for call sign WPQU240

Notice in the yellow highlights and bracketed comments, that whoever wrote this filing forgot to find/replace the location from the San Francisco-Oakland-San Jose filing, as well as changing the language from "rural areas", which are not really application for New York.

145.    Significantly, the Sinclair Report also observed that during the period 2002 to 2015, neither IDT nor Straight Path included any of the expected costs of a purported buildout of any of these BEAs in their financial statements filed with the SEC:

> he costs of development and ongoing lease sites for IDT's 173 "buildouts" do not appear nywhere in the SEC filings' financial statements in any year between 2002-2015 of IDT orporation, the S-1 IPO prospectus of IDT Spectrum, or Straight Path Communications. Th osts of building the sites out and the ongoing lease expenses (usual telecom rooftop lease 5 years) would either be expensed or capitalized and show up in the financials.

---

[5] Highlighting and bracketed text appears in original in a copy of the Substantial Service Notification for call sign WPQU240, available from the FCC website. http://wireless2.fcc.gov/ UlsApp/ApplicationSearch/applAdmin.jsp;JSESSIONID_APPSEARCH=SsSQXz8Cy0gLqjs6dYm G44NpdxTJQzvhntPQJzFgDdGLh12ysqZG!2142368569!1859206827?applID=6099102#

146.    On this news, the Company's shares fell $13.70 per share or almost 52% to close at $12.81 per share on November 5, 2015, damaging investors.

147.    Despite the severity of the information contained in – and the extreme negative investor reaction to – the Sinclair Report, Defendants did not even attempt to respond to it. Instead, and indicative of Defendants' scienter herein, Defendants (through a spokesman) told Bloomberg News in an e-mail on or about November 5, 2015, that Straight Path "does not respond to anonymous reports." To this day, Defendants have refused to take investor or analyst questions regarding the construction, or lack thereof, of Straight Path's licenses.

**D.    Defendants' Post-Class Period Admissions**

148.    After initially refusing to comment upon the Sinclair Report, on Nobember 24, 2015, Defendants issued a letter to stockholders, signed by Defendant Jonas, which was attached to the Company's FY 2015 annual report. The letter stated, in part:

> On the strength of our accomplishments to date and the hopes of what we may accomplish if our plans continue to materialize, the market bid up the value of our stock. However, following self-serving accusations written by self-identified holders of short positions in our stock, some of which accusations were posted anonymously, the market price fell significantly. We have responded to the critique of our company's goals and plans regarding 5G and outlined the basis for our view that this area remains an attractive opportunity that carries significant potential for the Company. Further, ***we do not believe that there is merit in the allegations raised in the anonymous "report" regarding the process by which many of our licenses were renewed by the FCC in 2010- 2011. As I write this letter, our investigation with respect to those allegations is well underway, and we will report to you when we have definitive responsive information to share***.

149.    Then, in a Form 8-K filed on December 1, 2015, Defendants stated the following, in part, regarding the Sinclair Report's allegations and the fruits of Defendants' "investigation" with respect thereto:

> There have been anonymous allegations regarding the circumstances under which certain of our spectrum licenses were renewed by the FCC in 2011 and 2012. Although we are conducting an investigation of the matter, we believe that the

requirements related to such renewals, including the required showings of substantial service, were met. We expect the investigation to take several months to complete. There are other requirements imposed by FCC rules and regulations on certain licensees, including restrictions on the discontinuation of operations. ***The preliminary results of our investigation into the renewal allegations indicate that a significant amount of the equipment that <u>had been installed</u> in connection with the substantial service showings <u>is no longer present</u> at the original locations.***

150.    Defendants substantially repeated this statement in their required quarterly filings on December 10, 2015, March 11, 2016, and June 9, 2016; however, in the Form 10-Q filed on June 9, 2016, Defendants attempted to distance themselves from the unequivocal statement that "equipment [ ] had been installed" and instead chacterized it as "equipment that *we understood* had been installed…." (emphasis added).

151.    Similarly, Defendant Jonas stated during the December 10, 2015, earnings call that:

We expect our investigation will take several months to complete. We have timely informed the SEC about the status of our investigation. We continue to believe that we have met the SEC requirements related to these license renewals, including required showings of substantial service. ***We are no longer present at the original location.*** We are arranging for placement equipment to be procured and deployed. During the pendency of the investigation ***we will not be responding to questions on the topic*** and we will refrain from providing updates that are not material.

152.    Defendant Jonas reiterated the ongoing investigation during the Company's March 11, 2016, earnings call, and further indicated that they were going to attempt to scramble to "back" their way into meeting substantial service requirements:

We are working with counsel and others and the investigation is still ongoing. We will report on the results when it's complete, which we are hopeful will be by June. ***In the meantime, we continue to execute on our plans for deployment of our spectrum for our own and our customers use.*** During the pendency of the investigation, we will not be responding to questions on the topic and we will refrain from providing updates until we have final definitive information.

153.    Defendants again ended their March 11, 2016 earnings call without taking analysts' questions.

154.    Then, in the Company's Form 10-Q filed on June 9, 2016, Defendants reiterated their intent to "back" their way into showing substantial service, and continued to tout the 5G growth story,  stating, in part:

> ***Rather than wait for the results of the investigation, we are deploying equipment across our 39 GHz holdings*** as part of our engagement of a broader customer base ahead of our roll out of upgraded equipment for PMP applications at 39 GHz in late 2016 or early 2017, while pursuing our long-term plans for providing 5G mobility services using our licensed spectrum. We believe that our licenses were properly renewed for a second ten-year term in compliance with applicable FCC rules.

155.    To date, Defendants have provided no further information, much less "definitive responsive information," regarding the construction or existence of the licenses. Indeed, Defendants have provided no credible explanation for their suggestion that these hundreds of licenses once constructed, operating, and providing substantial service to millions of people suddenly "disappeared" before their eyes, and without their knowledge. To this day, Defendants refuse to take questions from analysts or investors regarding the construction, or lack thereof, of Straight Path's licenses.

## VI.    MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

156.    During the Class Period, Straight Path purported to have 133 LMDS licenses (at 28 GHz frequency) and over 800 licenses in the 39 GHz band, and it represented these licenses as offering the premier frequency for 5G mobile communication. As alleged herein based upon the facts recited above, the vast majority of these licenses appear to have been fraudulently renewed by Straight Path (through its predecesor company, IDT/IDT Spectrum) based upon false attestations of construction and the provision of "substantial service" to covered areas.

157.    The Class Period starts on October 29, 2013, when the Company filed its annual report on Form 10-K for the fiscal year ending July 31, 2013 (the "FY 2013 Form 10-K"), signed by Defendants Jonas and Rand. The FY 2013 10-K also contained certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Jonas and Rand stating that the financial information contained in the 2013 Form 10-K was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

158.    The 10-K states, in relevant part:

*We hold a significant number of licenses for commercial fixed wireless spectrum in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz band and LMDS band.* We have at least 100MHz of bandwidth in every location in the United States, and in higher population areas, our licenses (including those we manage, but are still owned by IDT Spectrum) cover 600 MHz or more of bandwidth.

\* \* \*

Currently, the United States is divided into 176 EAs for the auctioned 39 GHz spectrum. *Our licenses cover most EAs, and, based on a comparison of the geographic areas covered by our licenses with the U.S. Census Bureau's 2010 Census, cover most of the U.S. population.* We hold multiple licenses in all U.S. markets including 814 39 GHz EA licenses, and 133 licenses in the LMDS band. Our 39 GHz licenses, which are our primary holdings, include at least 100 MHz of total bandwidth in every U.S. market, with up to 1,000 MHz in certain markets. We hold an average of 820 MHz of spectrum in the top 25 EAs. As a result, we believe that *we are well positioned to provide a single source of fixed wireless spectrum solutions across a variety of geographic areas and bandwidth requirements.*

\* \* \*

*As of October 24, 2013, Straight Path Spectrum has 814 39 GHz EA licenses* with an expiration date of October 18, 2020. *Straight Path Spectrum has filed its substantial service performance filings for its 39 GHz licenses. These showings have been accepted by the FCC*.

*Straight Path Spectrum also has 34 active 39 GHz RSA common carrier licenses*, the vast majority of which expire in early to mid-2017. *Straight Path Spectrum has filed substantial service showings for all of these active 39 GHz RSA licenses and these showings have been accepted by the FCC.*

*In addition, Straight Path Spectrum holds 133 LMDS licenses in the 28 GHz range*, of which 14 licenses expire on August 10, 2018, 118 licenses expire on September 21, 2018 and the New York City LMDS license expires on February 1, 2016. *Straight Path Spectrum has met its substantial service build-out obligations for its LMDS licenses*.

(emphasis added).

159.    The above-quoted statements from the FY 2013 Form 10-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications and the failures to construct necessary equipment and provide substantial services, including beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

160.    Defendants' FY 2013 Form 10-K SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

161.    On December 4, 2013, Defendants filed a Form 8-K with the SEC, attaching a slide presentation that Defendants provided to investors on the same date (the "December 2013 Investor Presentation and Form 8-K"). The Form 8-K was signed by Defendant Jonas. The December 2013 Investor Presentation states, in relevant part:

- ▪ **Straight Path Spectrum** (SPS) – *Holds nearly 1,000 FCC spectrum licenses providing wireless coverage across the entire United States*. Industry growth of *small cell deployment provides a next generation solution for the networks of the future*.

* * *

- • **Straight Path Spectrum is the largest holder of 39 GHz licenses in the US**

  - • Mobile data usage is exploding and *massive small cell roll outs are needed* to meet the increasing bandwidth demand

  - • *Portfolio includes 39 GHz (814 licenses) and 28 GHz LMDS (133 licenses covering all markets, with an average of 820 MHz/market in the top 25 markets*

  - • *Nationwide coverage with control of nearly 70% of the active 39 GHz spectrum*

* * *

**39 GHz Spectrum Provides a Cost Effective Solution**

- • *Straight Path controls nearly 70% of the active licenses and has nationwide coverage*

  - • *covers most of U.S. and U.S. Virgin Islands, covering 300 million residents (>90% of US)*

- • *Covers all markets with an average of 820 MHz in top 25 markets*

- • *100 MHz contiguous blocks*

- • *Substantial service requirements met through 2020*

- • *Also 133 LMDS licenses in the 28 GHz band*

* * *

KEY ASPECTS OF STRAIGHT PATH'S SPECTRUM

- ▪ **Broad Coverage:** *Straight Path Spectrum holds 814, 39 GHz licenses, covering 171 economic areas*

  - ▪ *Straight Path Spectrum holds 133, 28 GHz licenses*, including key markets such as NYC, San Francisco, and Orlando

* * *

- ▪ **Regulatory Assurance:** *Straight Path has satisfied substantial service for all of its 28 GHz and 39 GHz licenses*

  - ▪ *Substantial service has been satisfied for all SPS's 39 GHz licenses covering a population of more than 300 million.*

  - ▪ *Straight Path can utilize its licenses until at least 2020.*

(bold and underline emphasis in original; combined bold/italic emphasis added).

162.    The above-quoted statements from the December 2013 Investor Presentation and Form 8-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications and the failures to construct necessary equipment and provide substantial services, including beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

163.    On December 16, 2013, the Company filed a Form 10-Q for the quarter ending October 31, 2013 (the "1Q 2014 Form 10-Q"), signed by Defendants Jonas and Rand. The 1Q 2014 Form 10-Q contained SOX certifications signed by Defendants Jonas and Rand, stating that the financial information contained in the 1Q 2014 Form 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

164.    Defendants' 1Q 2014 Form 10-Q and SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that

Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

165.    On January 9, 2014, the Company held its "inaugural investor conference call to introduce Straight Path to the financial community." During the conference call, Defendant Jonas stated in relevant part:

> *Today, Straight Path Spectrum holds 814 39 GHz licenses, making us the largest holder of these licenses in the United States. We have coverage in all of the top 25 markets and are the only Company to have nationwide coverage in this space that is well suited for backhaul.* This is a unique asset in today's market where efficient, high bandwidth coverage is in such high demand. *We also hold 133 28 GHz licenses, many of them in the top markets, which supplement our core 39 GHz holdings and increase our coverage and bandwidth.*
>
> * * *
>
> Our 39 gigahertz and 28 gigahertz bands offer considerable advantages over other spectrum bands including less interference, better deployment, smaller antenna requirement and the ability to power point to multipoint networks.
>
> * * *
>
> To summarize, we believe our two operating units offer significant upside opportunity to investors. *Given the current wireless landscape and shift to 4G as well as future generations of new technology, we believe that increased demand for bandwidth will result in tremendous opportunities to exploit our spectrum holdings.* On the IP side, there continues to be numerous entities – large and small – that are using our IP without permission, and we will continue to explore all reasonable business and legal means to achieve compensation.

(emphasis added).

166.    During the January 9, 2014 conference call, Defendant Rand described Straight Path's plans for monitization of its purported license holdings, stating in part:

> *We believe the greatest long-term upside to monetize our Spectrum holdings is by leasing them in national or regional solutions.* There are a number of likely candidates to lease spectrum, the biggest of which are the national wireless carriers.

> Other potential lease candidates include broadband service providers, certain fiber networks and government and enterprise entities that need to expand their wireless networks or make them redundant.

(emphasis added).

167.    The above-quoted statements from the January 9, 2014 conference call were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

168.    Moreover, Defendant Jonas's statement that new mobile techonolgies will create "increased demand for bandwidth will result in tremendous opportunities to exploit our spectrum holdings" was materially false and misleading given that: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; and (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network.

169.    On March 17, 2014, the Company filed a Form 10-Q for the second quarter ending January 31, 2014 (the "2Q 2014 10-Q"). The 2Q 2014 10-Q was signed by Defendants Jonas and Rand and contained SOX certifications signed by Defendants Jonas and Rand, stating that the

financial information contained in the 2Q 2014 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

170.    Defendants' 2Q 2014 Form 10-Q and SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

171.    On March 18, 2014, Defendants held a conference call to discuss the second quarter of FY 2014 earnings. In speaking of the Spectrum division's "highlights of progress and prospects," Defendant Jonas touted the Company's supposed "entrepreneurial approach to leasing and partnering with others to maximize the value of our assets, the near-term opportunity to grow our revenue and further our market penetration and by introducing Straight Path Spectrum as a dynamic partner and provider of backhaul spectrum." Defendant Jonas further stated, in relevant part:

> ***Straight Path Spectrum has developed a win-win solution that will have manifold benefits, including increasing our revenue, leveraging existing sales personnel and brand recognition of our partners as well as deepening our market penetration and relevance as a premier provider of backhaul spectrum***.
>
> * * *
>
> Due to congestion of certain bands of spectrum, interference in other bands and uncertain pricing in others still, service providers find themselves in a conundrum where they need to commit to get the sale but cannot deliver because of the uncertainty of whether appropriate spectrum will be available at the right price point. ***We are solving that problem.*** We are inserting ourselves into the existing pipeline by partnering with leading equipment vendors and manufacturers who already have relationships with service providers and offering them a critical ability, the guarantee

of spectrum without interference or congestion and with guaranteed transparent pricing.

When service providers are offered a high quality radio that comes with a spectrum guarantee and at a competitive price, equipment sales we expect will increase and *new spectrum leases with Straight Path will be initiated, thereby, increasing our revenue, market penetration and our relevance* to both equipment and service providers as a premier provider of backhaul spectrum.

\* \* \*

Now, to focus for a few moments on the long-term potential of our Spectrum assets. *As spectrum goes, the most valuable spectrum is what is called access or mobile spectrum. Those are the frequencies that go directly to mobile devices and there is a gross lack of such spectrum. In order to compensate for the lack of available spectrum that has been used for mobile to-date, there is a growing body of study and testing focused on millimeter wave frequencies, specifically 28 and 39 GHz, as the next generation of mobile spectrum, widely known as 5G.* Initial tests have shown that even in congested urban environments, there is reason to believe that within appropriate distances, millimeter spectrum such as ours can be viable mobile access spectrum. It is a positive sign for the future of our business, when leading companies such as Intel, Samsung, Ericsson, AT&T, Qualcomm, and other industry leaders, are supporting the study of millimeter wave mobile spectrum, and, in some instances, are themselves doing testing and making plans to bring their results to market within the next number of years. *The implications for Straight Path are huge.*

(emphasis added).

172.     Also during the March 18, 2014 conference call, Defendant Rand emphasized the supposed value of the Company's spectrum licenses, stating, in relevant part:

On the Spectrum side of the house, *we expect to see some partnerships with radio vendors and/or radio distributors, several new Spectrum leasing customers*, and an upgraded marketing campaign. The new Spectrum customers are likely to be indicative of existing and new applications for our Spectrum that should be expandable to additional customers as well. We continue to make plans to demonstrate some of the newest radio technology working together with our Spectrum as a showcase to various network operators.

173.     The above-quoted statements from the March 18, 2014 conference call were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic

334906.1 STRAIGHTPATH                    62

coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

174.    Furthermore, Defendant Jonas's statements regarding the "huge" implications of mobile and 5G technology to Straight Path's license portfolio were materially false and misleading given that: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

175.    On May 29, 2014, Defendants filed a Form 8-K with the SEC, attaching a slide presentation that Defendants provided to investors on the same date (the  "May 2014 Investor Presentation and Form 8-K"). The Form 8-K was signed by Defendant Jonas. The May 2014 Investor Presentation largely repeats the statements set forth in the December 2013 Investor Presentation, and further states in relevant part:

- **Straight Path Spectrum, Inc.** – *Holds nearly 1,000 FCC spectrum licenses providing wireless coverage across the entire United States*.

* * *

| Spectrum | • *Straight Path holds 70% of all active 39 GHz spectrum – more than Spring & ATT in other bands* |
|---|---|
| Largest holder of | |

| 39 GHz Licenses in U.S. | • ***Nationwide coverage in all markets in U.S. and over 800 GHz in top 25 markets – inlcuding 39 GHz (814 licenses) and 28 GHz LMDS (133 licenses)*** |
| | • Data usage is exploding year over year |
| | • Multiple market needs for more Spectrum |

* * *

**39 GHz Spectrum Provides a Cost Effective Solution**

- ***Straight Path controls nearly 70% of the active licenses in the U.S.***
- ***Covering 300 million residents***
- ***Coveral all markets with average of 820 MHz in top 25 markets***
- ***100 MHz contiguous blocks***
- ***Substantial service requirements met through 2020***
- ***133 LMDS licenses in the 28 GHz band***

(bold emphasis in original; combined bold/italic emphasis added.)

176.    The above-quoted statements from the May 2014 Investor Presentation and Form 8-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

177.    On June 16, 2014, the Company filed a Form 10-Q for the FY third quarter ending April 30, 2014 (the "3Q 2014 Form 10-Q"). The 3Q 2014 Form 10-Q was signed by Defendants Jonas and Rand. The 3Q 2014 Form 10-Q contained SOX certifications signed by Defendants Jonas and Rand, stating that the financial information contained in the 3Q 2014 Form 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

178.    Defendants' 3Q 2014 Form 10-Q and SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

179.    On June 17, 2014, Defendants held a conference call to discuss the third quarter of FY 2014 earnings. During the call, Defendant Jonas again highlighted the supposed value of the Company's LMDS (28 GHz) and 39 GHz FCC license holdings, stating in relevant part:

> *The near-term opportunity to grow our revenue and further our market share is by introducing Straight Path Spectrum as a dynamic partner and provider of backhaul spectrum* for point-to-point and point-to-multipoint [ph] licensed links, an important component of hundreds of existing and new wireless networks.
>
> *Straight Path Spectrum has developed a win-win solution that offers network operators a number of benefits* including faster time-to-market, handling of all FCC filings and flexible lease terms….
>
>                                \* \* \*
>
> We are on various stages of negotiation with over a half-dozen leading equipment manufacturers and radio vendors to develop similar joint offerings whereby *our deep*

*portfolio of spectrum in both the 28 gigahertz and 39 gigahertz frequencies can be leveraged* to sell their gear to Internet and communication service providers.

These partnerships are designed to accelerate our go-to-market execution by highlighting the beneficial features of our spectrum to network operators. We expect that *equipment sales will increase and new spectrum leases with Straight Path will be initiated, thereby increasing our revenue, market penetration, and our relevance* to both equipment and service providers as a premier provider of backhaul spectrum.

\* \* \*

Moving on to the mid-term opportunities, we continue to see our spectrum assets as an ideal backhaul conduit for small cells, outdoor small cells in particular. *Our spectrum holdings, particularly in the 39 gigahertz band, are deep and broad enough to connect millions of small cells to the communication networks across the U.S.…*

\* \* \*

Now, let's turn our attention to the long-term opportunities for our spectrum assets. As we previously discussed, the wireless market is experiencing a spectrum crunch as there is not enough bandwidth in the mobile frequencies to support the growing demand. In order to compensate for the lack of available spectrum that has been used as mobile spectrum to-date, there's a growing body of research and testing focused on millimeter wave frequencies*, specifically 28 gigahertz and 39 gigahertz as the next generation of mobile spectrum often called 5G*.

(emphasis added.)

180.    Also during the June 17, 2014 call, Defendant Rand stated, in relevant part:

For our Spectrum subsidiary, *we expect to see more partnerships with radio vendors and equipment distributors [and] several new Spectrum leasing customers*,….

The new Spectrum customers are likely to demonstrate applications for our spectrum that should be expandable to additional customers as well….

(emphasis added.)

181.    The above-quoted statements from the June 17, 2014 conference call were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the

renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

182.    Furthermore, Defendant Jonas's statement that Straight Path's 28 GHz and 39 GHz licenses would be used in the future devlopment of 5G technologies was materially false and misleading given that: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

183.    Also during the June 17, 2014 conference call, an analyst specifically asked Defendants to provide an estimate of how many links Straight Path's supposed backhaul networks were then-currently providing, as well as a qualitative assessment of how well the networks were working. Whereas a forthright answer to this question would have revealed the truth of what Plaintiffs herein allege Defendants omitted to tell investors – *i.e.*, that most of the Company's FCC licenses were never built-out and that substantial service requirements were not actually met – thereby exposing the fraudulent nature of Straight Path's business, Defendant Jonas (only further indicative of his scienter herein) refused to answer the question and instead pivoted to state in general terms that the number of links in operation had increased during FY 2014 and would continue to experience a "significant ramp-up" in the near future:

> [Q – analyst]: Can you just sort of talk about – maybe you can give us a sense of how
> many links are out there that are either point-to-point or point to multipoint that are

using your spectrum currently and just maybe give a sort of a qualitative assessment of how you think they're working, sort of what you're seeing?

A - Davidi Jonas: Sure. Thank you for the question. This is Davidi. I'll take that question. ***In terms of the number of links that we have out, that's a number that we don't disclose.*** And part of the reason also why we don't disclose the number is that there are different types of leasing arrangements that we enter into with a diverse customer base. Some of them are link-by-link. Some of them are covering a broader geographical area. It's something that we call a block lease. Some of them are for smaller areas. Some of them are point-to-point. Some of them are point-to-multipoint.

And so***, in terms of the total number, we don't disclose*** as well as the caveat to that being that we wouldn't be able to fully – to give a full handle on the exact number given some of the different types of deployments. ***But we do see that number increasing over the next number of quarters that did increase already in this fiscal year. But we expect a significant ramp-up over the next three quarters to four quarters***.

(emphasis added.)

184.    The foregoing statements were materially false and misleading because Defendant Jonas knew or recklessly disregarded that the vast majority of Straight Path's purported 28 GHz and 39 GHz were never constructed, were not constructed to meet substantial service requirements, and/or were not in operation in June 2014.

185.    On September 3, 2014, the Company issued a press release entitled, "Straight Path Communications Hires CTO to Lead the Charge to 5G," in which Defendants Jonas stated, in part:

As we continue to execute on our near, mid, and long term business goals, Jerry will be an invaluable addition to our team, helping to ensure that our thought leadership and market strategy will unlock great value from our nationwide, unparalleled spectrum assets. ***We plan for our 39 GHz holdings to be the premier frequency for millimeter wave 5G mobile communication***, and our new CTO is an excellent choice to help us achieve that goal.

186.    Defendants' statement that Straight Path's 39 GHz license portfolio would be "the premier frequency" for 5G mobile communication was materially false and misleading given that: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses;

(ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

187.    On October 14, 2014, the Company filed a Form 10-K for the fiscal year ending July 31, 2014 (the "FY 2014 Form 10-K"). The 2014 Form 10-K was signed by Defendants Jonas and Rand, and contained SOX certifications signed by Defendants Jonas and Rand, stating that the financial information contained in the FY 2014 Form 2014 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

188.    Defendants' FY 2014 Form 10-K SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

189.    The FY 2014 Form 10-K further stated, in relevant part:

*We hold a significant number of licenses for fixed wireless spectrum ("Spectrum") in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz (Gigahertz) band and LMDS (or 28 GHz) band. We have 39 GHz Spectrum licenses covering the entire continental United States with an average of 833 MHz (Megahertz) of bandwidth in the top 30 U.S. markets (measured by population according to the 2010 U.S. Census), as well as LMDS licenses in many key markets.*

\* \* \*

Currently, the United States is divided into 176 EAs for the auctioned 39 GHz spectrum. *Our licenses cover 175 EAs, the only EA our Spectrum is not authorized for use is EA 176, the Gulf of Mexico*. Based on a comparison of the geographic areas covered by our licenses with the U.S. Census Bureau's 2010 Census, *we cover all of the U.S. population. We hold multiple licenses in all U.S. markets including 828 39 GHz licenses, and 133 licenses in the LMDS band.* Our 39 GHz licenses, which are our primary holdings, include at least 100 MHz of total bandwidth in every U.S. market, with up to 1,100 MHz in several markets. We hold an average of 833 MHz of spectrum in the top 30 EAs in the 39 GHz band. As a result, we believe that *we are well positioned to provide a single source of fixed wireless Spectrum solutions across a variety of geographic areas and bandwidth requirements*.

\* \* \*

The value of spectrum is generally determined by (a) the population it covers, (b) the bandwidth it can deliver, (c) the available technology available, and (d) the service it can provide. *Our Spectrum (a) <u>covers every inch of the United States</u>.* (b) We have an average of 833 MHz in the top 30 markets in the 39 GHz. *Such breadth and depth of coverage are unparalleled by any company*.

\* \* \*

*Straight Path Spectrum has filed its substantial service performance filings for its 39 GHz licenses. These showings have been accepted by the FCC which is effective for the current period of the licenses, through 2020. Therefore, as of October 14, 2014, Straight Path Spectrum had 828 39 GHz EA licenses with an expiration date of October 18, 2020. In addition, Straight Path Spectrum holds 133 LMDS licenses in the 28 GHz range, of which 14 licenses expire on August 10, 2018, 118 licenses expire on September 21, 2018 and the New York City LMDS license expires on February 1, 2016.* Straight Path Spectrum will be required to demonstrate substantial service in order to renew its licenses for another ten year term.

(emphasis added).

190.     The above-quoted statements from the FY 2014 10-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service," as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was

in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

191.    The FY 2014 10-K also addresses Straight Path's value in terms of 5G technology, stating in relevant part:

> …***Millimeter wave mobility in our frequency band(s) is perhaps the greatest potential opportunity for Straight Path Spectrum to maximize the usability and value of our spectrum assets.*** Straight Path Spectrum is actively pursuing this — being the only millimeter spectrum holder to become an Industrial Affiliate in the leading 5G think tank in the United States, NYU WIRELESS, as well as hiring Jerry Pi, a leader in 5G, as our Chief Technology Officer.
>
> *  *  *
>
> As the demand for significantly greater capacity within wireless networks has grown rapidly, planning and investment for 5G networks has already begun. ***Our Spectrum holdings—which cover the entire continental US, and have capacity that is substantially greater than currently used access frequencies are <ins>well-suited for use in a 5G network</ins>***. The FCC has recognized in the past that the frequencies in which we operate might one day be usable for mobility (i.e. access to mobile devices), but have deferred proposing and adopting rules to govern such usage until technology and market forces would justify such rule making.

(emphasis added).

192.    The above-quoted statements that use of Straight Path's spectrum licenses for mobility services and that its licenses are "well-suited for use in a 5G network" were materially false and misleading given that: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

193.   On October 14, 2014, the Company held a conference call to discuss the fourth

quarter of FY 2014 earnings. On the conference call, Defendant Jonas discussed Straight Path's

license portfolio, stating in relevant part:

> Speaking of working tirelessly to maximize the value of our assets, let me turn to our
> Spectrum division. Straight Path Spectrum has charted a near-term, mid-term and
> long-term strategy and we have taken important steps to deliver on each. Let's begin
> by discussing the near-term, growing our revenue, customer base, and  market
> penetration as a ***premier provider of fixed wireless backhaul services***.
>
> * * *
>
> Our ***congestion-free, interference-free spectrum*** coupled with scalable pricing and
> high quality radio technology, are causing service providers with the date [sic] would
> turn to the FCC for common carrier lines to ***consider our superior offering***. We
> expect that we will close a number of leases in fiscal 2015 and generate greater
> market awareness that will lead to customer and revenue growth.

(emphasis added.)

194.   Also during the October 14, 2014 conference call, Defendant Rand similarly stated, in

relevant part:

> In our Spectrum business, we expect to close new spectrum-leasing customers for
> wireless backhaul operations, secure more partnership with the radio vendors and
> other key industry players, continue to demonstrate and encourage some of the
> newest radio technology to further enhance the value and usability of our spectrum
> holdings, tighten our marketing profile within the wireless industry, and of course,
> we will continue our efforts regarding the technical and regulatory process and
> progress towards mobility in our bandwidth holdings.

(emphasis added.)

195.   The above-quoted statements regarding Straight Path's "premier" spectrum leasing

activities were materially false and misleading because they misrepresented and failed to disclose the

following adverse facts pertaining to Straight Path's business, operations, and prospects which were

known to Defendants or recklessly disregarded by them, including: (i) the vast majority of Straight

Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide

"substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of

Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

196.     Regarding the use of Straight Path's spectrum holdings for mobile services, Defendant Jonas stated, in part:

> New antenna and processing capabilities enable high-frequency waves to bypass interposing objects within limited yet substantial distances, having a potential coverage area far greater than wifi. ***The prospect of our spectrum being utilized for access to mobile devices is both real and a potential value game changer***. According to analysts, much of the spectrum that is used for mobile broadband is valued between $0.50 and $2 per MHz
>
> * * *
>
> While the commercial adoption of such technology is years away, the proverbial handwriting is on the wall. The industry leaders are committed, prototypes have been demonstrated, the process of refining, testing, miniaturizing, implementing, and deploying will take time. But we believe, and the FCC's actions bolster our belief, that ***our spectrum will be a critical element of mobile broadband in the foreseeable future***.

(emphasis added).

197.     Further, during the question and answer portion following Defendants' prepared remarks, Defendant Jonas described as one of Straight Path's primary stock price appreciation drivers "a recognition of the value that our spectrum may hold for mobile usage…"

198.     The above-quoted statements from the October 14, 2014 conference call, that 5G mobility would be a "game changer" and that Straight Path's spectrum would be a "critical element" of mobile broadband, were materially false and misleading because: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services

network, such as 5G; and (iii) Straight Path's spectrum holdings were *not* "a critical element of mobile broadband" and, in fact, suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (*see* ¶¶32, 41, 51, 136).

199.    On October 14, 2014, Defendants filed a Form 8-K with the SEC, attaching a slide presentation that Defendants provided to investors on the same date (the  "October 2014 Investor Presentation and Form 8-K"). The Form 8-K was signed by Defendant Jonas. The October 2014 Investor Presentation states in relevant part:

> **39 GHz Spectrum – Nationwide Band**
> - ***Controls 96% of active 39 GHz spectrum licenses in the U.S.***
> - ***Covering 300 million residents***
> - ***Covers entire US – average of 833 MHz in top 30 cities***
> - ***100 MHz contiguous blocks***
> - ***Substantial service requirements met through 2020***
> - ***133 LMDS licenses in the 28 GHz band***
> (all based on public FCC records)

(bold emphasis in original; combined bold/italic emphasis added.)

200.    The above-quoted statements from the October 2014 Investor Presentation and Form 8-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to

the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

201.   On December 10, 2014, the Company filed a Form 10-Q for the quarter ending October 31, 2014 (the "1Q 2015 Form 10-Q"). The 1Q 2015 Form 10-Q was signed by Defendants Jonas and Rand. The 1Q 2015 10-Q contained SOX certifications signed by Defendants Jonas and Rand, stating that the financial information contained in the 1Q Form 2015 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

202.   Defendants' 1Q 2015 Form 10-Q and SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

203.   Also on December 10, 2014, the Company filed a Form 8-K, attaching an earnings release of the same date, which Form 8-K was signed by Defendant Rand. In the filing, Defendant Jonas is quoted as having stated, in relevant part:

> I am pleased to announce that Straight Path continued to deliver strong financial results and secure important strategic positioning in the first quarter of our 2015 fiscal year. In particular, ***our long-term strategy to utilize our spectrum assets for mobile services took important steps forward***, as we hired Jerry Pi as our Chief Technical Officer, and the FCC published a Notice of Inquiry regarding the use of frequencies above 24 GHz for mobility. The NOI is a significant industry milestone

towards potential regulatory changes that could have important implications for the future of our spectrum holdings.

We continued to advance our mid-term strategy to utilize our spectrum for small cell backhaul, and we expect testing with our spectrum in fiscal 2015. ***Regarding our near-term strategy to increase revenue and utilization of our nationwide holdings for backhaul of existing wireless installations, we have seen growing interest, and expect to see impactful developments in fiscal 2015 and beyond***….

(emphasis added.)

204.     The above-quoted statements from the December 10, 2014 Form 8-K and earnings release were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture. Moreover, the statements regarding the use of Straight Path's spectrum licenses for mobile services were materially false and misleading given that: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

205.    Defendants also held an investor conference call on December 10, 2014 to discuss first quarter of FY 2015 results. During the call, Defendant Rand stated, in relevant part:

> Here are the key milestones to watch for in the coming quarters….
>
> In our Spectrum business, *we'll continue to execute on our vision of near-term backhaul, mid-term small cell, and long-term mobility.* These efforts should result in case studies of new spectrum leasing customers for wireless backhaul applications, announcements of new partnerships with radio vendors and other key industry players, testing and demonstrations of some of the newest radio technology to further enhance the value and usability of our spectrum holdings, media exposure within the wireless industry and of course, our continued efforts regarding the technical and regulatory progress towards mobility in our bandwidth, particularly with regards to responding to the FCC's Notice of Inquiry.

(emphasis added.)

206.    The above-quoted statements from the December 10, 2014 conference call were materially false and misleading because, in discussing the Company's near-term, mid-term, and long-term mobility strategies, Defendants misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture. Moreover, regarding mobility specifically, Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses, and

misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G.

207.   On February 25, 2015, the Company filed a Form 8-K with the SEC, attaching a slide presentation that Defendants provided to investors on the same date (the "February 2014 Investor Presentation and Form 8-K"). The Form 8-K was signed by Defendant Jonas. Like the previous Investor Presentations, the February 2014 Investor Presentation touted Straight Path's supposed spectrum holdings, claiming the "*Largest Spectrum Holdings in US*" and that the Company controls "*96% of active [39 GHz] [B]EA licenses*" (emphasis added).

208.   The above-quoted statements from the February 2015 Investor Presentation and Form 8-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

209.   On March 12, 2015, the Company filed a Form 10-Q for the quarter ending January 31, 2015 (the "2Q 2015 Form 10-Q"). The 2Q 2015 Form 10-Q was signed by Defendants Jonas and Rand. The 2Q 2015 Form 10-Q contained SOX certifications signed by Defendants Jonas and Rand,

stating that the financial information contained in the 2Q 2015 Form 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

210.    Defendants' 2Q 2015 Form 10-Q and SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

211.    Also on March 12, 2015, the Company filed a Form 8-K, attaching an earnings release of the same date, which Form 8-K was signed by Defendant Rand. The release described the Company as a "communications asset company that *holds an extensive portfolio of 39 GHz and 28 GHz wireless spectrum licenses with deep coverage across the entire United States*…."  In the filing, Defendant Jonas is quoted as having stated, in relevant part:

> In our Spectrum subsidiary, we made significant strides forward on our near, mid and long term plans. Working with the most innovative point-to-multipoint ("PMP") radio vendor for millimeter licensed frequencies, we secured new customers for our existing spectrum leasing business for fixed wireless applications. We expect the number of customers and leases to increase, especially in fiscal 2016. We continue to facilitate development of the next generation PMP wireless radios utilizing 39 GHz spectrum, which we hope to have available sometime in 2016. As small cell deployments are being planned by major mobile operators, with their vital need for backhaul, we have aligned ourselves with leading OEMs and systems integrators, and expect to formalize partnerships this fiscal year….

212.    The above-quoted statements from the March 12, 2015 Form 8-K and earnings release were materially false and misleading because in discussing the Company's near-term, mid-

term, and long-term mobility strategies, Defendants misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture. Moreover, regarding mobility specifically, Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses, and misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G.

213.    Defendants also held an investor conference call on March 12, 2015, to discuss second quarter of FY 2015 results. During the call, Defendant Jonas stated, in relevant part:

> Though IP has taken some heads in the short-term, *our Spectrum division has grown stronger, and its near-term, mid-term, and long-term prospects all offer exciting opportunities for value appreciation*. The near-term goal of expanding the use of our Spectrum for fixed services such as backhaul and last mile connectivity to residential and enterprise locations is gaining scene. The availability of cost-effective and high-quality equipment called radios in the industry that utilize our spectrum, builds value into our holdings.

> \* \* \*

> For Spectrum, *we see the most important task in the next few quarters as industry positioning, which should result in the securing of key partnerships with OEMs, MNOs and other industry participants.* These fields take time and several have been well underway for the better part of the past year. These fields will not likely result in

revenue in the short-term *but will certainly lay the groundwork for adoption of our spectrum and resulting leases and fees over the mid-term and longer terms*.

That said, we do *expect to continue growing our current spectrum lease customer base which should result in a modest rise in spectrum lease revenue over the coming quarters*. And, of course, we'll be doing everything possible to participate at all levels of the regulatory process with the FCC with a goal to have our spectrum be selected for mobility.

(emphasis added.)

214.    The above-quoted statements from the March 12, 2015 conference call were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

215.    During the same March 12, 2015 conference call, Defendant Jonas further commented on the Company's prospects for mobile business, stating in part:

> *On to our long-term goal mobile services*….
>
> * * *
>
> *Straight Path holds approximately 96% of the active 39 gigahertz spectrum licenses with a national footprint and an average of 840 megahertz in the top 25 markets*.
>
> Comparatively, we hold approximately 12.5% of the spectrum in disparate locations at the 28 gigahertz frequency…. We recognized that the non-usage of 39 gigahertz

by satellite operators makes it a simpler frequency for mobile services, and therefore perhaps a more likely band to move to a rulemaking proceeding relatively rapidly.

**And you can see in light of our holdings, [utilizing the 39 GHz band for mobile services] would present a huge opportunity for us**….

We are quite excited by the industry mobilization, [ph] don't pardon the fun (11:37) in favor of mobile services in the millimeter frequencies especially 39 gigahertz and 28 gigahertz. **Spectrum utility determines value, and we anticipate that having the flexibility to provide mobile broadband, perhaps the utility of greatest interest of the market and the financial communities will lead to many of signing substantially greater value to our spectrum**.

(emphasis added.)

216.   In response to an analyst question querying "the prospects for millimeter wave becoming the standard for 5G mobile broadband," Defendant Jonas further stated, in part:

I think for the millimeter wave frequencies, given the time horizon of probably between four years to six years before there is commercialization, I think **there is going to be enough of an inflection point for those licenses to continue to appreciate** and not be materially negatively impacted by recent costs that were incurred by the operators. That's one part of it.

The other is, it's the utility. **This is really going to become our mantra, it already is, but we're going to continue to say it over and over again. Utility determines value, and the <u>utility of millimeter wave spectrum is mobile broadband</u>**, it's gigabit per second throughput, and that's what the industry is moving toward, moving away from the lower frequency bands and coverage towards densification and capacity. And you could just look at the comments from Verizon, as a for instance where they are recognizing that as the price of spectrum goes up, they're going to have to start focusing more on densifying their networks with small cells. Which we think is **good for us in the mid-term, and certainly good for us in the long-term as millimeter wave mobility is really going to require a more densified mobile network**.

                                    * * *

[U]ltimately, I think the industry is moving toward mobility in the millimeter wave bands, and eventually it will be adopted. It's just the matter of how quickly and we're trying to try that process to be sooner rather than later.

(emphasis added.)

217.   The above-quoted statements from the March 12, 2015 conference call relating to mobile services were materially false and misleading because: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented

the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

218.    On June 9, 2015, the Company filed a Form 10-Q for the quarter ending April 30, 2015 (the "3Q 2015 Form 10-Q"). The 3Q 2015 Form 10-Q was signed by Defendants Jonas and Rand. The 3Q 2015 Form 10-Q contained SOX certifications signed by Defendants Jonas and Rand, stating that the financial information contained in the 3Q 2015 Form 10-Q was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

219.    Defendants' 3Q 2015 Form 10-Q and SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

220.    Also on June 9, 2015, Defendants held an investor conference call to discuss third quarter 2015 results. During the call, with regard to the ability of Straight Path's spectrum licenses to operate in the mobile market, Defendant Jonas stated, in relevant part:

> To start, as we had mentioned previously, technology advances have opened up a **new mobile spectrum frontier** and the FCC has recognized the importance of this technology to meet the growing demand for mobile broadband.

* * *

> ***The opportunity for Straight Path is monumental.*** As stated previously, the greater the utility of a particular frequency, the more valuable it is. Having the flexibility to provide mobile services in our frequencies increases the utility of our assets by many orders of magnitude and thereby the value of the assets as well.

(emphasis added.)

221.    Also during the call, Defendant Rand again reiterated the purported extensiveness of the Company's spectrum license holdings:

> The total megahertz POP is 255 billion, 85% of that is our 39 gigahertz at 216 billion and 15% of that is our LMDS at 39 billion megahertz POP and then the LMDS that itself breaks up into the A band and the B band. So of that 15% really, 11% is the A band and 16 licenses and the LMDS B band is 4% of our total at 117 licenses.

> Just want to also focus on the 39 gigahertz which is the 828 licenses, but that is total coverage in every single one of the FCC's authorized usage 175 economic areas. Of the 828 licenses, 370 of those licenses are in the top 50 metros and that covers about 75% of the U.S. population with an average of 740 megahertz in each of the top 50 metros.

222.    The above-quoted statements from the June 9, 2015 conference call relating to mobile services and the "***monumental***" opportunity for Straight Path were materially false and misleading because: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

223.    On July 20, 2015, Defendant Jonas participated on behalf of the Company in an interview with *The Wall Street Transcript*. Defendant Jonas is quoted as having stated:

> But the big opportunity is to make [Straight Path's spectrum] licenses more dynamic. ***They can be used for mobile services.*** Instead of using these high-throughput frequencies to connect a building or a house, they could go to people's cellular phones and bring gigabit-per-second throughput, which basically is the equivalent of Google Fiber to mobile devices.

224.    Defendant Jonas's statement that Straight Path's spectrum licenses "can be used for mobile services" was materially false and misleading because: (i) during the Class Period, Straight Path's license holdings were not authorized by the FCC for mobile services and could not be used for mobile services; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

225.    During the July 20, 2015 interview, in response to the question, "how would adoption of 5G impact Straight Path" Defendant Jonas further stated:

*5G is a game changer*, because the way it works with spectrum is that the greater utility it has, the more valuable it is.

\* \* \*

AT the end of the day, *there is no reason why our spectrum cannot or should not be used for mobile services*.

In fact, the Federal Communications Commission already recognized that [Straight Pathh's spectrum holdings should be used for mobile services and that, one day, it would be used for mobile services. They kicked the can down the road a bit till the technology developed. Now that the technology has developed and has demonstrated that mobility can work in these higher frequencies, that's really where *our focus on 5G, I think, has changed the nature of the company from being a company that hopefully would ramp up revenue and become profitable and so on to a company that might be sitting on undeveloped real estate that is right in the heart of New York City, Los Angeles, Chicago, right in the heart of the every major market* just waiting to be built up.

\* \* \*

And 28 and 39 certainly have been identified as being the low-hanging fruit within licensed millimeter wave frequencies. So we do feel like *we are sitting on the next generation of spectrum*.

\* \* \*

*We think the preliminary value, the value today, is not an actual reflection of the value*. To give an example, right now the company is valued at between $300 million

and $350 million. Mobile spectrum is generally priced on what they call a per megahertz-pop basis, the amount of people that are covered by the frequency. We own 255 billion megahertz-pops, which is the equivalent of all of the mobile frequencies that are currently used in the U.S. So just based on that number, *if you gave us $0.01 per megahertz-pop valuation, which would be very modest for a cellular frequency, <u>the company would be valued at $2.5 billion</u>*.

(emphasis added.)

226.    Defendant Jonas's statements regarding the value 5G mobility brings to the Company's spectrum holdings – including that 5G is a "game changer" and that "there is no reason why our spectrum cannot or should not be used for mobile services" –  were materially false and misleading because: (i) during the Class Period, Straight Path's license holdings were not authorized by the FCC for mobile services and could not be used for mobile services; (ii) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (iii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iv) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

227.    On October 14, 2015, the Company filed its Form 10-K for the fiscal year ending July 31, 2015 (the "FY 2015 Form 10-K"). The FY 2015 Form 10-K was signed by Defendants Jonas and Rand and contained SOX certifications signed by Defendants Jonas and Rand, stating that the financial information contained in the FY 2015 Form 10-K was accurate, that all fraud was disclosed, that "disclosure controls and procedures were effective," and that any material changes to the Company's internal control over financial reporting were disclosed.

228.    Defendants' FY 2015 SOX certifications were materially false and misleading because: (i) Defendants failed to disclose all fraud "whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over

financial reporting;" and (ii) Straight Path woefully lacked sufficient internal controls, exemplified by the fact that Defendants claim to have failed to detect for years that the spectrum licenses that Straight Path claimed to own and operate, in fact, were not in operation and that, in Defendants' own words, "a significant amount of the equipment" used to justify Straight Path's substantial service obligations "is no longer present at the original locations."

229.    The 2015 10-K further stated, in relevant part:

> *We hold a significant number of licenses for fixed wireless spectrum ("Spectrum") in the United States, providing broad geographic coverage and a large amount of total bandwidth in many areas. These include licenses in what is known as the 39 GHz band and Local Multipoint Distribution Service ("LMDS" or "28 GHz") band. We have 39 GHz Spectrum licenses covering the entire continental United States with an average of 800+ megahertz ("MHz") of bandwidth in the top 30 U.S. markets (measured by population according to the 2010 U.S. Census), as well as LMDS licenses in many key markets.*
>
> * * *
>
> Currently, the United States is divided into 175 licensable EAs for the auctioned 39 GHz spectrum. *Our licenses cover all 175 EAs.* Based on a comparison of the geographic areas covered by our licenses with the U.S. Census Bureau's 2010 Census, we cover all of the U.S. population. *We hold licenses in all U.S. markets including 828 39 GHz licenses (90+% of active EA licenses), and 133 licenses in the LMDS band. Our 39 GHz licenses, which are our primary holdings, include at least 100 MHz of total bandwidth in every U.S. market, with up to 1,100 MHz in several markets. We hold an average of 800+ MHz of Spectrum in the top 30 EAs in the 39 GHz band. As a result, we believe that we are well positioned to provide a single source of fixed and mobile wireless Spectrum solutions across a variety of geographic areas and bandwidth requirements.*
>
> * * *
>
> *Straight Path Spectrum has filed its substantial service performance filings for its 39 GHz licenses. These showings have been accepted by the FCC which is effective for the current period of the licenses, through 2020. Therefore, as of October 14, 2015, Straight Path Spectrum has 828 39 GHz EA licenses with an expiration date of October 18, 2020. In addition, Straight Path Spectrum holds 133 LMDS licenses in the 28 GHz range, of which 14 licenses expire on August 10, 2018, 118 licenses expire on September 21, 2018 and the New York City LMDS license expires on February 1, 2016.* Straight Path Spectrum will be required to demonstrate substantial service in order to renew its licenses for another ten year term.

(emphasis added).

230.    The above-quoted statements from the FY 2015 Form 10-K were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Straight Path's business, operations, and prospects which were known to Defendants or recklessly disregarded by them, including: (i) the purported breadth of geographic coverage was false given that the vast majority of Straight Path's licenses were never constructed, and/or were not constructed in a manner sufficient to provide "substantial service" to the vast majority of its licenses, as required for renewal; (ii) the renewal of Straight Path's spectrum holdings was obtained by false or fraudulent means; (iii) Straight Path was in violation of FCC rules requiring it to continue to provide substantial services throughout the license term; and (iv) due to the false information contained in Substantial Service Notifications, and the failures to construct necessary equipment and provide substantial services beyond the initial license term, Straight Path's licenses were subject to termination and forfeiture.

231.    The 2015 10-K also discussed Straight Path's 5G technology, stating in relevant part:

On October 17, 2014, the Federal Communications Commission (the "FCC") released a Notice of Inquiry ("NOI") to examine the potential for the provision of mobile radio services in bands above 24 Gigahertz ("GHz"), and identified 39 GHz and 28 GHz as two potential candidates. ***These bands make up our primary Spectrum holdings, and we believe if the FCC and the wireless industry adopt these bands for mobile use in such applications as 5G networks, such actions may have a significant, ongoing favorable impact on the value of these assets.***

* * *

Our Spectrum is currently used primarily to provide fixed wireless services for existing Wireless Internet Service Providers ("WISPs") and Mobile Network Operators ("MNOs"). ***Our Spectrum is also contemplated for use in next generation mobile solutions such as small cells and 5th Generation Mobile Networks ("5G").***

* * *

As the demand for significantly greater capacity within wireless networks has grown rapidly, planning and investment for 5G networks has become a major focus of the mobile industry. ***Our Spectrum holdings—which cover the entire continental US***

> **and have capacity that is substantially greater than currently used access frequencies—are well-suited for use in a 5G network.**

(emphasis added).

232. The above-quoted statements from the FY 2015 Form 10-K were materially false and misleading because: (i) Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

233. Defendants also held an investor conference call on October 15, 2015 to discuss fourth quarter and year-end FY 2015 earnings results. During the call, Defendant Jonas touted the supposed likelihood of high frequency bands to be utilized by 5G technology, stating in part:

> We do not want to read too much into things unsaid, but the unspoken message of the FCC is that the 27.5 to 29.5, or 28 gigahertz, and 37 to 40.5, comprising the entirety of the 39 gigahertz band, are where licensed mobile services will be considered in the [Notice of Proposed Rulemaking, or "NPRM"]. We have addressed in the past what makes 39 gigahertz particularly attractive. There are no satellite operations at 39 gigahertz. It is already licensed by geographical area. It is also a globally harmonized band for mobile services.
>
> \* \* \*
>
> **Presently, and in good measure resulting from our advocacy, the joint proposal of industry leaders is to include bands at least up to 40 gigahertz in phase 1.** We are supporting US-based universities, and now we are making a thoughtful, strategic investment that can be of enormous value, both to Straight Path and the United States. At our Gigabit Mobility Lab, **we will be the first US company to develop a 5G system, and we will be the first internationally to do so at 39 gigahertz**. We expected to demo the technology in the US within 18 months. If our efforts are successful, we feel it will make our Company that much more valuable.
>
> \* \* \*
>
> In terms of 28 and 39 gigahertz, we feel very encouraged by the -- by what's happened in the NOI, and also the blog posts of [FCC] Chairman Wheeler, and what seems to be teed up for the NPRM, **where we feel that the frequencies for licensed services to provide mobile service in millimeter wave bands almost exclusively is focused on the frequencies in which we hold such a significant degree of spectrum**

*in such strategic locations.* So we feel that's been a great progress, and I think in great part due to the efforts that we've put forward. And *we've made ourselves a -- hopefully, a valuable partner to the Commission*, as they move forward.

(Emphasis added.)

234.     Also during the October 15, 2015 conference call, which Defendants Jonas and Rand

both attended, the Company's Chief Technology Officer, Jerry Pi stated:

We believe the prime spectrum for 5G is between 24 gigahertz and the 57 gigahertz, from both of the regulatory and technological perspectives. On the one hand, the 5G NOI proceeding from the FCC, and the 5G CFI from the off-com, demonstrate that it is extremely difficult to obtain multiple gigahertz of spectrum below 24 gigahertz for 5G.

On the other hand, the solid-state circuit technology above 57 gigahertz has not yet achieved the level of power and efficiency required for 5G as a wide area mobile broadband technology. *In particular, the 39 gigahertz band, a long ways to LMDS band, and at the 37 to 38.6 gigahertz band, are attractive as potential spectrum for 5G. We are actively working with the regulatory bodies to enable 5G mobile services in this band.*

 (Emphasis added.)

235.     During the conference call, Defendant Jonas also responded to an analyst's pointed

question about the value and breadth of Straight Path's spectrum portfolio:

Lance Vitanza, CRT Capital Group: Cutting to the chase, if 5G is ultimately centered around millimeter wave, roughly what percentage of what we would call, I guess, usable millimeter wave spectrum, from a regulatory standpoint, what percentage of that would Straight Path control?

Defendant Jonas: …*[A]ssuming that the primary focus [of the FCC], we feel, will be on 27.5 to 29.5 and 37 to 40.5, we -- in the 28 gigahertz band, we hold about 10% of the spectrum, including New York City and San Francisco, by megahertz top. And <u>in the 38.6 to 40, we control about 95% of the active licenses</u>, in terms of total megahertz*….

(Emphasis added.)

236.     The above-quoted statements from the October 14, 2015 conference call pertaining to

Straight Path's spectrum holdings and 5G mobility were materially false and misleading because: (i)

Defendants overstated Straight Path's coverage and supposed monopoly on 39 GHz band licenses; (ii) Defendants misrepresented the utility and ability of its spectrum holdings to meet the needs of a mobile services network, such as 5G; and (iii) Straight Path's spectrum holdings suffered from numerous complications and limitations that presented a serious bar to 5G entry, as alleged herein above (at ¶¶32, 41, 51, 136).

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Straight Path's Spectrum Business Was and Is Its Core Operation

237.   Straight Path was a small company at all relevant times hereto. The Company's FY 2013 Form 10-K reports three (3) employees; the FY 2014 Form 10-K reports six (6) employees; and the FY 2015 Form 10-K reports seven (7) employees.

238.   Straight Path's spectrum business (SPSI) was Defendants' primary focus and core operation during the Class Period. Defendant Jonas himself stated on July 20, 2015:

> ***The I.P. sector has always been a short-term cash flow business to really feed the long-term opportunity of our spectrum division***. The 20-year patent we hold expires in September of this year. So the patents are almost expired. Then, we will go for damages, which may have a six-year look-back period, but either way, that's not really a long-term business. There is no real reason to split it off as it does generate additional revenue, and it can give us greater flexibility to develop our long-term strategy on the spectrum side.
>
> If we never make another $0.01 from the I.P. business, that's also a circumstance that we've prepared for. ***The I.P. business is not core to the company at this point, and given the additional market focus on spectrum, on 5G, on millimeter waves, on Straight Path, the I.P. business just sort of hangs around***, and we expect that it will time out on its own accord within the next couple of years. (emphasis added.)

### B.   Straight Path Spectrum Is Merely IDT Spectrum Renamed; Also, the Individual Defendants Were Both IDT Executives Involved in Spectrum-Related Activities Prior to the Straight Path Spin-Off

239.   Straight Path Spectrum is merely IDT Spectrum under a new name.  Defendants, themselves, repeatedly refer to the two entities interchangeably, including in Straight Path's own

Class Period SEC filings.  For example, in Straight Path's FY 2014 Form 10-K, Defendants used

"Straight Path Spectrum" clearly to refer to the actions of "IDT Spectrum," stating, for example:

> In October 2010, **Straight Path Spectrum paid** an aggregate of $210,000 to renew
> certain of its 39 GHz FCC licenses….

240.    Similarly, in each of Straight Path's Form 10-Ks filed with the SEC during the Class

Period, Straight Path referred to itself as the entity that completed the Substantial Service filings,

stating: "**Straight Path Spectrum has filed its substantial service performance filings** for its 39

GHz EA licenses[.]"

241.    Additionally, although Michael Rapaport left IDT before the Straight Path spin-off,

Straight Path's Class Period SEC filings repeatedly refer to Rapaport as "the Former SPSI [Straight

Path Spectrum, Inc.] CEO."

242.    Moreover, the Individual Defendants were both IDT executives prior to the Straight

Path spin-off. According to the Company's November 26, 2013 Proxy Statement, "[p]rior to the

Spin-Off, our executive officers were employed by IDT Corporation…."

243.    Also according to the Company's November 26, 2013 Proxy Statement, Defendant

Jonas "has served as Chief Executive Officer, President and Director of SPCI [Straight Path

Communications, Inc.] since April 2013 and has served as Vice President, Business Development of

IDT Corporation and manager of Straight Path Spectrum since August 2012 and served as Executive

Vice President and director of Straight Path IP Group from November 2012." The Proxy Statement

went on to describe Defendant Jonas's skills and experience as follows: "**Mr. Jonas is very familiar**

**with the operations included within SPCI and its subsidiaries, as well as IDT's previous efforts to**

**generate value from the related assets**." (emphasis added.)

244.    In the January 9, 2014 conference call, Defendant Jonas described himself as part of

the "IDT strategic development team" that decided to do the Straight Path spin-off.

245.     The introduction to Defendant Jonas's July 20, 2015 interview with *The Wall Street Transcript* described his position at Straight Path and his former position at IDT as follows:

> Mr. Jonas was part of the strategic team to determine that IDT could better realize the true value of its spectrum and intellectual property divisions in an independent entity. Mr. Jonas *implemented a strategic plan, directed all aspects of the creation and spinoff of Straight Path Communications, and managed the day-today operations* of the spectrum and I.P. divisions.

246.     According to the Company's November 26, 2013 Proxy Statement, Defendant Rand "has served as Chief Financial Officer of SPCI since June 2013." Rand also served as "Executive Vice President of Sales & Finance and Treasurer of IDT Corporation from 1992 to 1998."

**C.      A Private Trust Created for the Benefit of Defendant Jonas's Father, Howard Jonas, Holds a Majority of Straight Path Voting Power**

247.     Prior to the spin-off of Straight Path from IDT on July 31, 2013, IDT directly (and Howard Jonas indirectly by virtue of his voting control of IDT) owned 787,163 shares of Straight Path Class A common stock and 10,693,211 shares of Straight Path Class B common stock. On July 31, 2013, IDT–Howard Jonas fully divested its shares of Straight Path common stock, resulting in the transfer of *all* 787,163 shares of Class A common stock and 1,403,349 shares of Class B common stock to the Patrick Henry Trust. Howard Jonas – the founder of IDT, controlling stockholder of IDT, Chairman of the IDT Board of Directors, the CEO of IDT from October 2009 to December 2013 (while the fraudulent renewals alleged herein were filed with the FCC), and the father of Defendant Davidi Jonas – is the trustor of the Patrick Henry Trust, and retains all economic benefits of the trust.

248.     In total, the Patrick Henry Trust owns 2,190,512 shares of Straight Path common stock, representing approximately 19% of all outstanding shares. Yet, because (i) the voting power of Straight Path Class A common stock is three votes per share, while the voting power of Straight Path Class B common stock is one-tenth per share, and (ii) the Patrick Henry Trust owns all

outstanding Straight Path Class A common stock, the Patrick Henry Trust holds an aggregate voting power of 72%.

### D.  Both Individual Defendants Sold Straight Path Stock During the Class Period and Enjoyed Performance-Based Compensation and Bonuses

249.    Individual Defendants reaped the rewards of Defendants' fraud while Straight Path's stock price was artificially inflated. During the Class Period, Davidi Jonas sold approximately 15,000 shares of Straight Path Class B common stock for net proceeds of nearly $540,000. Viewed in comparison to his 2013 fiscal year salary of $99,115, his 2014 fiscal year salary of $197,231, and his 2015 fiscal year salary of $325,000, this amount was substantial. Significant among his Class Period stock sales, Davidi Jonas sold 9,000 shares on September 10, 2015 at $33.33 per share – a shockingly high price compared to the closing price of Straight Path shares in the weeks prior to the transaction, which had wavered between $21 and $24 before beginning to climb on September 8, 2015. Similarly, Davidi Jonas sold 6,000 shares on September 24, 2015 at $40.00 per share – the first day that Straight Path's shares ever closed at over $40.00.

250.    Meanwhile, Rand sold 3,000 shares of Straight Path Class B common stock for net proceeds of approximately $61,000. Excluding shares that were withheld by the Company for tax purposes, Rand had no trading activity prior to the Class Period.

251.    In addition to these lucrative stock sales, both Individual Defendants also enjoyed performance-based bonuses. According to the Company's proxy statements for the years 2013 through 2015, Straight Path provided Individual Defendants with a base salary, cash bonuses, and "incentive equity awards." Throughout the Class Period, Rand was entitled to a discretionary "cash bonus of up to 100% of his base salary (or up to 120% or higher upon extraordinary performance)," to be determined by the Compensation Committee with input from Jonas. In turn, throughout the Class Period, Jonas was "entitled to a cash bonus equal to 2.5% of the Company's net income… in a

calendar year," plus a discretionary cash bonus to be determined by the Compensation Committee with input from Jonas himself. Additionally, in each year during the Class Period, the Compensation Committee approved a Stock Option and Incentive Plan, whereby the Individual Defendants received grants of restricted Class B common stock, to vest over three years.

252.    According to the Company's 2013 Proxy Statement, for fiscal year 2013, Jonas received a base salary of $99,115 and a grant of 229,608 shares of Restricted Stock (with a grant date value of $1,301,887), and Rand received a base salary of $20,192 and a grant of 38,268 shares of Restricted Stock (with a grant date value of $219,021).

253.    According to the Company's 2014 Proxy Statement, for fiscal year 2014: (i) Jonas received a base salary of $197,231, a cash bonus of $60,000, and a grant of 71,000 shares of Restricted Stock (with an aggregate grant date value of $2,002,647); and (ii) Rand received a base salary of $175,000, a cash bonus of $45,000, and a grant of 38,628 shares of Restricted Stock (with an aggregate grant date value of $730,220). In determining performance-based bonuses, the Compensation Committee noted, "Mr. Jonas was a key participant in the development of the mid and long term strategies and plans for [Straight Path Spectrum]," while also noting Mr. Rand's "contributions to the Company's operations, particularly the developments at Straight Path Spectrum, [and] the plans for the development of the short, mid and long-term strategies for that business."

254.    According to the Company's 2015 Proxy Statement, for fiscal year 2015: (i) Jonas received a base salary of $325,000, a cash bonus of $90,000, and a grant of 60,000 shares of Restricted Stock (with an aggregate grant date value of $1,494,900); and (ii) Rand received a base salary of $250,000, a cash bonus of $50,000, and a grant of 30,000 shares of Restricted Stock. In determining Jonas's performance-based bonus, the Compensation Committee applauded Jonas for

"his lead role in advocacy for the inclusion of milimeter wave spectrum for mobility applications with the FCC and the wireless communications industry."

## VIII.   LOSS CAUSATION

255.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

256.    Defendants' wronful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and other Class members. During the Class Period, Plaintiff and other Class members purchased or acquired Straight Path securities at artificially inflated prices in reliance on Defendants' material misrepresentations and/or omissions. The price of those securities declined significantly when information was disclosed to the market for the first time during the Class Period revealing those material misrepresentations and/or omissions.

257.    Prior to October 29, 2015, Defendants had misled investors regarding the utility and ability of Straight Path's spectrum holdings to meet the needs of a mobile services network. Investors learned the truth, when, on October 29, 2015, Kerrisdale Capital published a report entitled, "Straight Path Communications Inc. (STRP) The Next Generation of Overblown Spectrum Hype" (the "Kerrisdale Repor"). The Kerrisdale Report questioned the commercial viability of Straight Path's spectrum licenses, especially as related to the viability of Straight Path's supposed plan to serve the 5G market with its microwave spectrum licenses. In reaction to the Kerrisdale Report, the price of Straight Path's stock fell $18.23 per share, or over 38%, to close at $29.35 per share on October 29, 2015.

258.    Prior to November 5, 2015, Defendants had also misled investors regarding the Company's compliance with FCC regulations and the risk of license termination. Investors learned the truth about the Company's fraudulent representations when, on November 5, 2015, Sinclair

Upton Research published a report entitled, "Straight Path Communications Inc. (STRP) *How to commit fraud against the FCC and get away with it (until now)*" (the "Sinclair Report") (emphasis in original). The Sinclair Report revealed that the Company's 39 GHz licenses were renewed only after the Company fraudulently misrepresented to the FCC that it had complied with the FCC's substantial service requirements for license renewal. In reaction to the Sinclair Report, the price of Straight Path's shares fell $13.70 per share, or almost 52%, to close at $12.81 per share on November 5, 2015.

## IX.   **PRESUMPTION OF RELIANCE**

259.   At all relevant times, the market for Straight Path's securities was efficient for the following reasons, among others:

    a.   Straight Path's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b.   As a regular issuer, Straight Path filed periodic reports with the SEC and NYSE;

    c.   Straigh Path regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.   Straight Path was followed by  securities analysts employed by brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain of their customers.

260.   As a result of the foregoing, the market for Straight Path stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price.  Under these circumstances, all purchasers of Straight Path securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices, and a presumption of reliance applies.

261.   In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute*

*Citizens of Utah v. U.S.*, 496 U.S. 128 (1972), because the claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

262.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false or misleading statements pleaded in this Complaint.

263.   The statements complained of herein were not forward-looking statements, nor were they identified as such when made.  Rather, the statements at issue herein – including statements about the Company's compliance with FCC regulations, as well as statements about the utility and ability of Straight Path's spectrum holdings to meet the needs of a mobile services network – were statements of historical fact or statements of purportedly current facts and conditions at the time the statements were made.

264.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the statements. Such factors include, among others, Straight Path's failure to comply with FCC regulations, the false filing of hundreds of Substantial Service Notificaitons, and the accompanying risk of license termination, as well as the numerous complications and limitations that presented a serious bar to 5G entry for Straight Path's spectrum holdings. Given these then-existing facts which were not adequately disclosed, any generalized risk disclosures were insufficient to insulate Defendants from liability for their materially false and misleading statements.

265.   Alternatively, Defendants are also liable for any forward-looking statements because the speaker knew or recklessly disregarded that the statements were false or misleading when made,

or the statement was approved by an Individual Defendant who knew or recklessly disregarded that the statement was false when made.

## XI.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

266.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Straight Path common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

267.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Straight Path common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Straight Path or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

268.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

269. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

270. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Straight Path;

- whether the Individual Defendants caused Straight Path to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Straight Path common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

271. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

272. There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

273.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

274.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

275.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Straight Path common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Straight Path common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

276.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the

market for Straight Path common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Straight Path's finances and business prospects.

277.    By virtue of their positions at Straight Path, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

278.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Straight Path common stock from their personal portfolios.

279.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Straight Path, the Individual Defendants had knowledge of the details of Straight Path's internal affairs.

280.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Straight Path. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Straight Path's businesses,

operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Straight Path common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Straight Path's business and financial condition, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Straight Path common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

281.    During the Class Period, Straight Path common stock were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Straight Path common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Straight Path common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Straight Path common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

282.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

283.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

284.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

285.    During the Class Period, the Individual Defendants participated in the operation and management of Straight Path and conducted and participated, directly and indirectly, in the conduct of Straight Path's business affairs. Because of their senior positions, they knew the adverse non-public information about Straight Path's current financial position and future business prospects.

286.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Straight Path's business practices, and to correct promptly any public statements issued by Straight Path which had become materially false or misleading.

287.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Straight Path disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Straight Path to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were

"controlling persons" of Straight Path within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Straight Path common stock.

288.   Each of the Individual Defendants, therefore, acted as a controlling person of Straight Path. By reason of their senior management positions and/or being directors of Straight Path, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Straight Path to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Straight Path and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

289.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Straight Path.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XIV.   DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 17, 2016                    Respectfully submitted,


                                        **SCHNADER HARRISON SEGAL & LEWIS
                                        LLP**


                                        *s/Lisa J. Rodriguez*
                                        Lisa J. Rodriguez
                                        Woodland Falls Corporate Park
                                        220 Lake Drive East, Suite 200
                                        Cherry Hill, NJ 08002-1165
                                        Telephone: (856) 482-5222
                                        Facsimile: (856) 482-6980


                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Robert V. Prongay
                                        Kara M. Wolke
                                        Alexa Mullarky
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, California 90067
                                        Telephone:  (310) 201-9150
                                        Facsimile:   (310) 201-9160


                                        *Lead Counsel for Lead Plaintiff and the Proposed
                                        Plaintiff Class*

                                        **LAW OFFICES OF HOWARD G. SMITH**
                                        Howard G. Smith, Esquire
                                        3070 Bristol Pike, Suite 112
                                        Bensalem, PA 19020
                                        Telephone: (215) 638-4847
                                        Facsimile: (215) 638-4867


                                        *Additional Counsel for Lead Plaintiff*

334906.1 STRAIGHTPATH                   106